JAMES D. HAYES, Respondent, v. WABASH RAILROAD COMPANY, a Corporation, Appellant, No. 41517—233 S. W. (2d) 12.

Division Two, September 11, 1950.

Rehearing Denied, October 9, 1950.

1224

*Joseph A. McClain, Jr., Lashly, Lashly, Miller & Clifford* and *Oliver J. Miller* for appellant.

1226

*Raymond L. Falzone* and *Everett Hullverson* for respondent; *Forrest Boecker* of counsel.

1228

LEEDY, J.—Action under the Federal Employers' Liability Act, 45 U. S. C. A., § 51 et seq., for personal injuries growing out of two separate and distinct casualties which were alleged (in one count) to have occurred on different days in September, 1947. The date of the first is certain, September 5. There is much uncertainty and confusion in the record as to the precise date of the second (whether the 26th or 27th), but as no point is made in this connection, we will, for convenience and brevity, refer to it as having occurred September 27. The jury found for plaintiff, and awarded $10,000 damages with reference to the September 5 occurrence, and $45,000 with reference to the September 27 occurrence. The trial court ordered a remittitur of $5,000 as to each award, with which plaintiff complied, and judgment was accordingly rendered for $5,000 and $40,000, aggregating $45,000, from which defendant railroad appeals.

1230

Viewing the evidence in the light most favorable to plaintiff, and according him the benefit of all reasonable inferences to be drawn therefrom, as is our duty in determining defendant's challenge of the sufficiency of the evidence on the issue of negligence, the facts may be thus stated: Plaintiff worked for the railroad in employment protected by the Federal Act. The first accident (September 5) involved a through freight train from Stanberry to Moberly, on which he was acting as rear brakeman. He was riding in the caboose. As the train approached Bedford, it was traveling at approximately 40 miles per hour. At that time plaintiff had started toward the rear platform, when, according to his testimony, he was suddenly and violently thrown to the floor and against the corner of the caboose, with his head down. He remembers his feet were in the air, it picked him up so heavily. The assistant trainmaster and conductor, who had been riding in the cupola, helped him up from the floor and asked him if there was anything wrong, but he couldn't talk because the breath had been knocked out of him. He said he knew he was bruised and hurt but assumed it wouldn't amount to a whole lot, and so proceeded with his work. That night he went to the hotel and noticed a discoloration in the lower part of his back. He sat in a tub of hot water trying to get a little heat on it, and rubbed Minit-Rub on it. While he testified it bothered him constantly, he did not go to a doctor, although he continued to work every day until the occurrence of September 27. Certain cars just ahead of the caboose had become derailed. Defendant's evidence tended to show such derailment was caused from the track having "kicked out from underneath the train" on account of a sun-kink. Plaintiff's submission as to this occurrence was under the res ipsa loquitur doctrine, and on the appeal from the portion of the judgment rendered thereunder defendant raises only the question as to whether, as a predicate of a portion of plaintiff's instruction on the measure of damages, there was any substantial evidence of permanent injuries resulting from the occurrence, and complains that the verdict was "obviously so large as to show the jury was prejudiced." These questions will be noticed in connection with our discussion of closely allied questions raised by defendant concerning the amount of the other and larger award.

The casualty of September 27 occurred in the afternoon, and involved a switching movement in defendant's yard at Moberly. Plaintiff had reported there in response to a call for him to go on his run to Stanberry. His duties as a brakeman included that of looking up the caboose in the yard, and making preparations for the trip, such as sweeping it out, putting ice in the ice box, supplying drinking water, and filling the signal lanterns carried on the rear of the train. All of the cabooses are kept on a single track, which is referred to as the caboose track, and it may contain as many as 20 or 30 cabooses in line. On this occasion, according to plaintiff's testimony, there were

two or three cabooses behind his, and several ahead of it, and cars on the adjoining tracks. He further testified that while he was in the middle of the aisle of the caboose, and "in a bent over position" filling a small coal oil can out of a two-gallon coal oil can, "there was just a violent, unusual movement of the cars; in fact, the engine coupled into them so strong that it threw me backwards over to the extent of 5 or 6 feet, and I hit the lower part of my back in almost the identical spot I had been injured before [September 5];" that he hit against the corner of the metal coal box; that it made him "deathly sick" at the time, and he fell on the floor and finally crawled up on the caboose pad, and laid there 20 or 30 minutes, and got up and "cleaned up the mess [he had vomited] the best I could." He also testified he stayed in the caboose until it was put into the train, and by that time he had gotten to feeling better, and went to the yard office and told his immediate superior, the conductor, that he had gotten knocked down in the caboose and that it had made him a little sick. He knew, of course, that the caboose was to be made up into his train, but he did not know at what time that would be done. He stated that he was accustomed to the ordinary and usual jerks incident to coupling movements—"they have coupled into cabooses a thousand times that I have been in just as smoothly as it could be; it would hardly move your feet * * * I never had any trouble before." He referred to the jerk as "very unusual—just extremely hard * * * no person could have possibly stood up in this caboose and been on his feet after this coupling was made." The switchman had to go by the caboose, but neither he nor anyone else gave any warning as to the fact that there was going to be a coupling. Plaintiff did not know whether this violent movement was incidental to switching his own caboose or some other caboose on that track. Because of its location—"the caboose being three or four deep back in the track, and cars on either track, on either side"—he had no way of knowing the coupling was to be made.

Notwithstanding the mishap, plaintiff continued his work, and made the run to Stanberry, as scheduled. He testified he could not go to bed that night (at Stanberry where he had an eight-hour layover) because of his pain, and that he didn't "get a bit of rest at all." He made his run back to Moberly the next day feeling "terrible—awfully sore;" he could hardly get around; and, in fact, informed the head brakeman they would have to stop the train to let him climb on after he closed the switch. He arrived in Moberly late in the afternoon, and went to his hotel, where he required assistance to get upstairs and to bed. He was too sore to take a bath, did not sleep, and "suffered it out" that night, and the next morning entered Wabash Employees' Hospital at Moberly. Other facts in reference to the nature and extent of his injuries will be stated in connection with

our discussion of the assignments questioning the amount of the awards.

The members of the switch crew were called by defendant, and none of them recalled any rough handling of a caboose at the time plaintiff claimed to have been injured. The effect of their testimony was that in such operations cabooses are handled as though someone were in them, and that all equipment is switched as easily as possible. None of the conductor's wheel reports (for the freight on which plaintiff was a member of the crew) for any of the days that might have been involved showed any complaint by plaintiff of being injured, or of rough handling. The conductor testified that he had no personal recollection ▮ of plaintiff complaining, and that if anybody had been injured or had complained, it would have been noted on his wheel report; that plaintiff said nothing about any injury and he (witness) therefore made no note. However, this witness did state that one evening in the yard office, when they were going out on a run, plaintiff said ''that he wasn't going in the caboose any more until we got ready to leave town because they rough-handled him up there * * * says he was slammed around in the caboose.''

▮ Defendant's assignments raise these questions as to the submission concerning the September 27th occurrence: (1) The propriety of plaintiff's instruction No. 2; (2) the sufficiency of the evidence to justify the submission of the issue of defendant's negligence; and (3) the excessiveness of the verdict. Part of the attack upon plaintiff's instruction No. 2 presents the same question raised under defendant's further point that judgment should have been entered for it ''because there was insufficient substantial evidence of negligence produced by plaintiff,'' and so both will be treated together. Plaintiff's instruction No. 2 told the jury that if the caboose was suddenly bumped and jarred with unusual and unnecessary force and violence, and that defendant, by the exercise of ordinary care, could have known of plaintiff's presence in the caboose, but failed to look for and discover his presence therein, and failed to devise and put into effect rules regulating the warning of its employees in cabooses during coupling movements, and if the jury further found that under the aforesaid circumstances, the defendant failed to exercise ordinary care in making the coupling movement, and failed to exercise ordinary care to furnish and maintain a reasonably safe place for plaintiff to do the work in which he was then engaged on behalf of the defendant, ''then you are instructed that defendant was negligent, and if you find that such negligence, either in whole or in part, caused injuries to the plaintiff, then your verdict must be in favor of plaintiff and against the defendant'' as to that occurrence.

It is urged that the instruction ''was not supported by sufficient substantial evidence since the statement of plaintiff himself that the coupling was unusual and extraordinary, not corroborated, was biased

opinion of no evidentiary value;'' and that ''it misdirected the jury because it was not part of defendant's duty to warn plaintiff of a coupling which he knew was impending.''

What constitutes negligence making a railroad liable in damages under the Federal Employers' Liability Act is a federal question, not varying in accordance with the differing conceptions of negligence applicable under state and local laws for other purposes, and is governed by federal decisional law formulating and applying the concept. Urie v. Thompson, 337 U. S. 163, 174. It was said in Wilkerson v. McCarthy, 336 U. S. 53, 69 S. Ct. 413, 93 L. Ed. 497, 504-505, that ''the issue of negligence is one for juries to determine according to their finding of whether an employer's conduct measures up to what a reasonable and prudent person would have done under the same circumstances. And a jury should hold a master 'liable for injuries attributable to conditions under his control when they are not such as a reasonable man ought to maintain in the circumstances,' bearing in mind that 'the standard of care must be commensurate to the dangers of the business.' Tiller v. Atlantic Coast Line R. Co., 318 U. S. 54, 67, 87 L. Ed. 610, 617, 63 S. Ct. 444, 143 A. L. R. 967. * * * And peremptory instructions should not be given in negligence cases 'where the facts are in dispute, and the evidence in relation to them is that from which fair-minded men may draw different inferences.' ''

The case of Gulf, Mobile & Northern Railroad Co. v. Wells, 275 U. S. 455, 72 L. Ed. 370, is heavily relied on in support of the contention that plaintiff's testimony concerning the violent nature of the coupling was of no evidentiary value, and hence insufficient to support the instruction. The same point was made, upon the reasoning and authority of that case, in the comparatively recent case ▮ of Pashea v. Terminal R. Assn., 350 Mo. 132, 165 S. W. 2d 691, which was also an action under the Federal Employers' Liability Act. There the plaintiff, a brakeman, fell from the top of a freight car when the train allegedly stopped with an unusual and sudden stop. Plaintiff related what he claimed occurred (''The train was stopped all of a sudden with a terrific stop, or unusual stop. It stopped unusual, and buckled and twisted in every shape * * * It jerked and swung around 'and wrastled around,'' etc.) and that this caused him to be thrown off the end of the car. Defendant's evidence denied any such stop occurred. The contention now urged was fully discussed and disallowed, the court holding that it was for the jury to say whether it believed plaintiff's testimony as to what occurred, and its effect, including the interpretation to be given plaintiff's descriptive terms—''shake,'' ''jerked,'' ''twisted,'' etc. In that connection numerous cases were cited in which the evidence was held to be sufficient to show a negligent stop or jerk. Under that decision it follows that such cases as Hedrick v. Mo. Pac. Ry. Co., 195 Mo. 104,

1234

93 S. W. 268, and Tickell v. St. L., I. M. & S. Ry. Co., 149 Mo. App. 648, 129 S. W. 727, (both involving injuries to passengers riding in cabooses) are not apposite; and that the question of whether the coupling was made with unusual and unnecessary force and violence, as alleged in the petition and submitted in the instruction, was clearly one for the jury under plaintiff's own testimony and the other surrounding facts and circumstances. The evidence as to the manner of making the coupling is sharply conflicting, as between plaintiff's version and that of defendant, so that on the question of whether it was any part of defendant's duty to warn, the facts are such that fair-minded men may draw different conclusions. That issue was, therefore, one for the jury.

■ Defendant makes the further point that that feature of the instruction was erroneous which submitted negligence based on failure to devise and put into effect rules regulating the warning of employees because there was no evidence to support it and because the jury had "no experience from which to draw, and such is a question of law for the courts." We need not pause to determine the merits of this contention for the reason it will be noted that the instruction submits the several grounds of negligence in the conjunctive, and so under the settled practice, there having been sufficient evidence to support the other charges, there could have been no prejudice to the defendant in requiring the finding of an unnecessary matter, if such it was, in the conjunctive with other and proper submissions. Rinderknecht v. Thompson, 359 Mo. 21, 220 S. W. 2d 69; Griffith v. Gardner, 358 Mo. 859, 217 S. W. 2d 519.

■ The other objection urged against the instruction is that it conflicted with defendant's instruction No. 9, and therefore furnished an improper guide to the jury. No. 9 told the jury that if "at the time plaintiff entered the caboose on the occasion mentioned in evidence, he knew that the switching crew, of which he was a member, would within a short time move said caboose into another part of the yard and attach it to a train about to leave, and with which train plaintiff was to depart as part of its crew, then and in that case defendant's failure to give a signal or warning that the caboose was to be moved or to inspect the caboose to discover the presence of plaintiff, if you find defendant failed to do so is immaterial and does not constitute negligence and plaintiff is not entitled to recover on those grounds." Plaintiff asserts that if there was conflict between these instructions, it was introduced by the defendant in submitting No. 9, which was erroneous and should never have been given, and hence defendant cannot complain. This contention must be sustained. No. 9 should not have been given. One of its required findings was that plaintiff was a member of the *switching* crew, whereas, the undisputed evidence was that he was a member of the *train* crew. We agree with plaintiff that this would tend to mislead and confuse the

jury if for no other reason than that, as a member of the switching crew, he would naturally be regarded as in a position to know all about the ▮▮▮ switching movements of the crew with which he was working. Moreover, the instruction excuses failure to give a signal or warning or to inspect the caboose to discover plaintiff's presence therein if, at the time he entered the caboose, he knew that within a short time it would be moved, and this regardless of the nature of the coupling—whether ordinary, as defendant's evidence tended to show, or unusual and with unnecessary force and violence, as plaintiff's evidence tended to show. Whatever conflict there was resulted from this self-invited error on defendant's part, and it may not complain. Baker v. Railroad, 122 Mo. 533, 26 S. W. 20 [overruling Bluedorn v. Mo. Pac. Ry. Co., 108 Mo. 439, 18 S. W. 1103]; Christian v. Connecticut Mut. Life Ins. Co., 143 Mo. 460, 45 S. W. 268, and Thompson v. Moon Buggy Co., 155 Mo. App. 597, 134 S. W. 1088.

This brings us to a consideration of the amount of the judgment. Here, also, is the evidence to be viewed in the light most favorable to plaintiff. The trial was held in January, 1949, some 15 or 16 months after the accidents. Plaintiff, 40 years of age at the time of the trial, has a wife and child, a boy. His life expectancy, under the United States Life Tables, was shown to be 30.3 years. He had returned to work as a brakeman for the defendant in August, 1945. He admitted his actual earnings averaged approximately $2000 for the year 1946, and $1800 for $1947. He claimed his job would have averaged $350 or $400 a month if he could have worked all the time, but that illness of other members of his family, and other outside interests, made it impossible for him to work more than he did. He testified he spent 19 days in the Wabash Hospital on his first trip there, 17 or 19 days on the second, and 3 weeks on the third; that ever since the occurrence of September 27 he has had to sleep on a board in his bed, is in constant pain, and has to take sedatives and pain killers; that except for a "nervous stomach," he had previously been strong and healthy; that he had had no trouble with his back; that he cannot bathe or dress himself, and that he had not earned a dime since the accident. On cross-examination, he admitted that, as a member of the Wabash Hospital Association, he was entitled to free medical, surgical, dental and hospital service.

His wife thus summarized his condition:

"Q. Now, what, if anything, did you do for Mr. Hayes in connection with his treatment or his care? A. Well, he practically has to have constant attention, too. He isn't able to pick anything up off the floor; if he happens to drop it, he has to push it over to me, regardless of where I am, and I will go get it for him; or he pushes it over to me with his foot, and he has not put his shoes and socks on since the accident. He has not been able to bathe himself or dress himself, and he requires attention. At night he doesn't sleep; he

doesn't rest at all, and he has to sleep on a board, and he has to have my constant attention; I have to sleep in there on the same bed and take care of him, and we give him alcohol rubs and apply heat and sedatives, and just everything that we think he can get a little rest.

"Q. How does he sleep at night? A. He doesn't—

"Q. Does he need any attention during the night? A. Why, absolutely. He doesn't sleep more than an hour any night at one time.

"Q. Does he take these pills? A. Yes, he takes pills, the sedatives the doctor prescribes. * * *

"Q. Do you massage him? A. Sure."

Plaintiff's medical evidence shows that he suffered a herniated nucleus pulposis, or ruptured disc, between the fifth lumbar vertebra and the sacrum, with resulting nerve irritation—"that is what gives him' this severe difficulty, the pressure against these nerve roots. * * * The disc has been compressed downward, allowing the vertebral to be depressed down against the sacrum, and this is what .is called the coupling joint, the one that couples the spine onto the pelvis." The disc is the soft, spongy material that is in the pad between every one of the vertebrae and serves as a shock absorber, as in an automobile, making it easy to sit down, jump, etc. As the result of a myelogram performed in St. Louis in December, 1947, he developed what the hospital records at Moberly described as "meningitis, sterile, post-mylographic, severe." Such condition can be caused by the opaque substance injected into the spinal canal as a part of the normal myelogram procedure. He walks with a rigid, awkward gait, and wears a steel brace extending over the upper part of the body from the hips up. He has lost the normal lumbar lordosis (which means that his back is "pretty straight"), with "almost complete limitation of his lower thoracic [part on which the chest is supported] and lumbar [lower part close to the pelvis] spine."

The condition is "extremely painful and disabling." In reference to its permanency, Dr. Pernoud testified thus: "Q. In your opinion, Doctor, can this man ever perform any manual labor? A. He cannot. Q. What is your opinion with regard to the permanency of any of these conditions? A. I think the condition, as we see it, is a permanent condition."

Defendant argues that "the injury is a condition which can be corrected by an operation under local anesthesia in 45 minutes to one hour, with practically no danger to life and with almost certain return to his normal occupation in a few weeks." The evidence upon which this contention is based came from defendant's medical experts. The jury was at liberty to, and apparently did, disregard it. Testimony on behalf of plaintiff touching the question was this (Dr. Pernoud testifying): "Q. What have you to say as to a .possible operation? A. In the first place, an operation, even if it was done on a normal spine * * * would cause an extreme amount of dis-

ability. * * * There is no case of this kind you can operate on and cure, because the very act of taking out this disc means much pain and much disability in the future, permanent in the future. * * * In approximately 25 per cent of them, their symptoms are somewhat relieved; some of them are not benefitted at all, and many of them will get worse, so that it is an operation that, on the whole, promises very little.''

Dr. West, the family physician, advised plaintiff not to be operated on for a while. He expressed the view that "the operation is not always a success, and it leaves them in a worse condition than it was before." He further testified: "Q. Is or is not this condition a permanent condition? A. It is a permanent condition unless he is operated on and relieved by the operation. Q. Doctor, in your opinion, will this man be able to do any manual labor of any kind? A. No, sir."

Dr. Jostes (also plaintiff's witness) testified that it was his belief that there were very few such operations resulting in complete relief of pain and no disability. Asked if, in his opinion, the plaintiff's condition was permanent, he answered: "While we know an operative procedure will remove, or can possibly remove such pressure, we, in all honesty, cannot say that it is a prudent thing. It is permanent if we don't do anything further about it.

"Q. It is permanent if you don't operate? A. That's right.

"Q. Then if you do operate, can you tell whether it is going to relieve it? A. No, I don't think anybody can promise at all.

"Q. You just do your best? A. I am saying this in all honesty; we do it every day and we have to do it because of severe pain, but I think in all honesty you cannot say too much about it.''

As to the amount of the award growing out of the September 27 occurrence, defendant's point is that the verdict "indicates upon its face and by its amount that it was founded upon misguided passion and prejudice." This court in the very recent case of O'Brien v. L. & N. R. R. Co., 360 Mo. 229, 227 S. W. 2d 690, 693, reiterated its previous holdings concerning that question, saying: "After an examination of many cases we conclude the rule in this state to be that an excessive verdict in and of itself does not establish that the verdict was the result of passion and prejudice." It is also charged that such award (September 27) is excessive when compared with similar cases, and that the September 5 verdict "should be reduced further to a sum commensurate with the evidence."

We find nothing to support the contention that the jury disobeyed the instructions and awarded double damages. One medical expert for defendant and one for plaintiff agreed that the herniated disc could have occurred as the result of either accident, or both of them; and under all the evidence, the jury would have been warranted in finding that the combination of the two injuries resulted in the

condition we have described, and so it was within the province of the jury to apportion the damages as between the two casualties.

"There is no accurate scale for measuring the money value of the damages sustained. Each case must be considered upon its own peculiar facts, giving some consideration to economic conditions (the decline in the purchasing power of the dollar) and having regard to a reasonable uniformity of awards." Van Campen v. St. Louis-San Francisco Ry. Co., 358 Mo. 655, 216 S. W. 2d 443, 449. See, also, Joice v. M.-K.-T. R. Co., 354 Mo. 439, 189 S. W. 2d 568, 577, 161 A. L. R. 383; Young v. Terminal R. R. Assn., (Mo.) 192 S. W. 2d 402; Tatum v. Gulf, M. & O. R. Co., 359 Mo. 709, 223 S. W. 2d 418.

The trial court regarded the verdict as excessive by $10,000, and plaintiff entered a remittitur in that amount as a condition to the overruling of defendant's motion for judgment or for a new trial. Upon a consideration of the facts outlined above, we are constrained to hold that the judgment, as reduced by the trial court, is still excessive to the extent of $7,500 when compared with the cases just cited, and other recent ones such as Smiley v. St. Louis-San Francisco Ry. Co., 359 Mo. 474, 222 S. W. 2d 481; Hilton v. Thompson, 360 Mo. 177, 227 S. W. 2d 675; O'Brien v. L. & N. R. Co., 360 Mo. 229, 227 S. W. 2d 690; Prince v. K. C. Southern Ry. Co., 360 Mo. 580, 229 S. W. 2d 569; Osburn v. K. C. Southern Ry. Co., 360 Mo. 813, 230 S. W. 2d 856, 861. Of course, bodily injuries and other elements affecting the award of damages, such as permanency, loss of earnings, pain and suffering, medical expenses, etc., are never alike in any of the adjudicated cases, and so comparisons will not reveal anything approaching exactness, nor was such intended by reference to the foregoing cases. If plaintiff will remit $7,500 within 15 days, the judgment will be affirmed as of the date of its rendition for $37,500; otherwise, it will be reversed, and the cause remanded. All concur.