**BRANDOCK**

v.

**ATCHISON, T. & S. F. R. CO.**

No. 43455.

Supreme Court of Missouri.
En Banc.

June 14, 1954.

John H. Lathrop, Sam D. Parker, Kansas City, Coburn, Storckman & Croft, Richmond C. Coburn, St. Louis, for appellant.

Cox, Cox & Cox, Harvey B. Cox, Harvey B. Cox, Jr., William A. Moffitt, Jr., St. Louis, for respondent.

COIL, Commissioner.

Defendant-appellant's engineer, Andrew S. Brandock, was injured when train No. 42 which he was operating eastwardly ran into the rear of defendant's train No. 109 standing on the main line (single track) near Newdale, Colorado. Plaintiff-respondent submitted his case to the jury under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., on the sole issue of whether defendant violated the Safety Appliance Acts, 45 U.S.C.A. §§ 1, 9, in that 42's brakes failed to operate efficiently and

if so, whether such caused, in whole or in part, plaintiff's injuries.

Defendant appealed from plaintiff's $45,000 judgment and contends the trial court erred in failing to direct a verdict for defendant, and in instructing the jury; and that the judgment (reduced from $65,000 by remittitur) is excessive.

Defendant, while suggesting that plaintiff's case was "flimsy" and that defendant's evidence on the sole issue of whether 42's brakes operated efficiently outweighed plaintiff's to the contrary, does not contend that there was not sufficient evidence from which the jury reasonably could find that the train brakes did not work efficiently and that if they had 42 would have stopped short of the collision point. Essentially, defendant's contention is: "that plaintiff breached defendant's rule 285, that such violation contributed to cause his injury and, therefore, defendant says, plaintiff could not recover irrespective of whether defendant's violation of a provision of a safety appliance act also contributed to cause plaintiff's injury.

Rule 285 ("Yellow Lights") is: "Proceed, preparing to stop at next signal; if exceeding medium speed, immediately reduce to that speed." "Medium speed" means 40 m.p.h. maximum.

Defendant, to show the rule violation, relies upon these questions and plaintiff's answers on cross-examination: "Q. Of course; but, the rule says that after you pass a yellow signal, you must be prepared to stop at the next signal? A. That's what the rule says. Q. Were you prepared to stop at 5632, two miles away when you came to it? A. No."

Train 109 preceded 42 out of Pueblo and stopped at the Newdale stockyard to switch; 109's brakeman went back west and flagged oncoming 42; nevertheless, the collision occurred. The parties agree upon some physical facts and distances: From the east edge of Rocky Ford to the east edge of Newdale there are, west to east, 3 automatic block signals, numbers 5652, 5632 and 5622; the distance between 5652 and 5632 is 10,290.7, and between 5632 and 5622, 4371.1 feet; when 42 passed them, 5652 and 5632 were yellow and 5622 was red. The collision point was 861.7 feet east of 5622; 109's flagman was 1794 feet west of the collision point when he flagged 42.

■ We find defendant's contention untenable because it is, and, must be, based upon the fallacious assumption that the fact that plaintiff was not "prepared to stop" when he "came to" signal 5632 was, as a matter of law, a proximate cause of the collision. It has been noted that the collision occurred east of signal 5622 and that 5622 is some 4300 feet east of 5632. Plaintiff testified that about 500–1000 feet before he reached 5632 (yellow) he made a service reduction (which should have but didn't slow his train) in preparation for a stop at 5622 if such became necessary; that when he saw the flagman (about 250 feet before he reached the flagman who was standing 933 feet west of signal 5622) and employed emergency procedure, including full application of all brakes, his train would have stopped several hundred feet before it reached 5622, if the brakes had worked properly. Thus, plaintiff testified he observed rule 285 when he passed yellow signal 5632, which was 4371 feet west of 5622; in other words, he was prepared to stop at 5622 except for failure of brakes. Now, just how failure to have been prepared to stop at 5632 when he passed that signal, which was yellow and at which no stop was required, could have been a proximate cause at all of the collision may be difficult to work out. But we need go no farther than to reach the obvious conclusion that we may not say that, as a matter of law, plaintiff's failure to have been prepared to stop at 5632 was a proximate cause of the collision. If such failure (i. e. to have been prepared to stop at 5632) did contribute in any way to the collision, such was a fact which (assuming facts in evidence from which the jury could so find) the jury would need to find. Defendant did not submit that question to the jury but, as noted, contends that the trial court should have declared that as a matter of law the violation of the safety

rule did in fact contribute to the collision. This, the trial court could not do. Consequently, even if we assume without deciding that plaintiff did, as a matter of law, breach rule 285 we must, nevertheless, hold that the trial court did not err in failing to direct a defendant's verdict.

Defendant also contends that plaintiff's violation of rule 285 was the sole cause of the collision. What we have said necessarily disposes of this contention. For, if we may not declare as a matter of law the rule violation a proximate cause, it follows that we may not say that as a matter of law the rule violation was the *sole* proximate cause.

We refrain from unnecessarily determining whether in any event the law is as defendant contends, viz., that if plaintiff did violate rule 285 and if the violation contributed to cause plaintiff's injury, plaintiff could not recover, even though defendant's violation of a provision of a Safety Appliance Act also contributed to cause plaintiff's injury.

■ Instruction 1 hypothesized: the acts which plaintiff said he did in an attempt to stop the train, and whether as a result of such acts, the train would have stopped prior to the collision point if the brakes had operated efficiently. The instruction then directed that an affirmative finding as to such hypothesized matters required the conclusion that defendant had violated the Safety Appliance Act, and that, if the jury further found that the collision was caused in whole or in part by such violation and plaintiff was injured, the verdict should be for plaintiff.

Defendant says the instruction was erroneous because it failed to hypothesize for the jury such matters as the size, make-up, weight and speed of the train, the grade of the track, the time required for the full retarding force of the brakes, and when the brakes failed to work; and that, without a finding as to these matters, the jury did not have before it sufficient facts or circumstances from which it could reasonably find that the brakes failed to operate efficiently.

Whether in other circumstances it would have been necessary to hypothesize some of these evidentiary matters, we need not determine. This, because instant defendant's evidence made it unnecessary in any event to have submitted such matters to the jury. Defendant adduced evidence of certain tests it had conducted by a train like (for all practicable purposes) the involved train; the test train was the same size, weight and make-up, was equipped with the same type of brakes, and the tests were conducted over the same track, and at the same speeds as both plaintiff's and defendant's evidence indicated were the speeds at which the involved train traveled at the crucial times preceding the collision and which related to stopping distances. The results of these tests showed that a duplicate of the train in question, on the same track, handled as plaintiff said he had operated his train, would have stopped, with efficient brakes, prior to the collision point; that if the train in question was being operated, at the time plaintiff said he applied emergency procedure, not at the speed to which plaintiff testified but at the speed indicated by the speedometer tape (defendant's evidence), then efficiently operating brakes would not have stopped the train prior to the collision point. Plaintiff testified that, even if the train had been traveling at the speed the speedometer tape indicated, still the procedure he used at the times and in the manner testified by him would have stopped the train prior to the collision point if its brakes had operated efficiently.

In other words, under the evidence in this case, the only essential question was whether at either speed, that particular train, on that particular track would have stopped prior to the collision point if the brakes had operated efficiently, and the instruction did submit that question.

■ Defendant also urges that instruction 1 was erroneous because it hypothesized as one of plaintiff's acts that he made a "service reduction of 10 to 12 pounds of air" which he held until signaled by the

flagman to stop, when there was no testimony that the service reduction referred to was in fact 10 to 12 pounds. Plaintiff testified that he made various "service reductions" on his run from Pueblo through Rocky Ford and that each of them had been about 10 pounds. It is true, as defendant contends, that plaintiff did not testify that the service reduction he made when 1000 to 500 feet from yellow signal 5632 (the one hypothesized in the instruction) was of any particular poundage. He said: "Then I made a reduction of air, preparing to stop at the next signal." However, in each of two hypothetical questions asked plaintiff by his counsel was included the assumed fact that at the place in question plaintiff made a service reduction of *10 to 12 pounds,* and although objections to these questions were made by defendant, they did not include the ground that either question included facts not in evidence; furthermore, when defendant's counsel was examining defendant's witness Lester the following question was asked: "Now, Mr. Brandock said that traveling back here 500 feet from signal 5632, at which time he was going no more than 40 miles an hour, that he made a service application of the brakes, 10 or 12 pounds"; etc.

We think it clear that at the trial both plaintiff and defendant assumed as a fact that the service reduction referred to by plaintiff was one of 10 to 12 pounds; and we believe it was a fair inference from all the evidence that the service reduction made by plaintiff at the time referred to in the instruction was similar (as to poundage) to those previously made. In any event, we may not say that, under the circumstances disclosed by the record, the inclusion of the assumed fact in the instruction was sufficiently prejudicial to affect the merits of the action or to deprive defendant of a fair trial. Section 512.160, subd. 2 RSMo 1949, V.A.M.S.

■ Defendant says further that the instruction "was erroneous because it directed the jury to find that the brakes (engine brakes) were inefficient when the plaintiff testified that they worked when he applied the emergency." Defendant argues in this connection: that the undisputed evidence showed that train 42 was equipped with two kinds of brakes, automatic air brakes operating throughout the train and independent engine brakes operating only upon the three diesel units making up the engine; that plaintiff said that the independent engine brakes worked when he applied them; that "brakes" as used in the instruction could refer only to "engine brakes" and "braking system" could refer only to the automatic air brake system; that, nevertheless, the instruction permitted the jury to find that the train would have stopped before the collision "if the brakes and braking system" had operated efficiently and that failure to stop required the jury to find that the "brakes and braking system" were not efficient. From all of which defendant concludes that the instruction was "contrary to the evidence."

Suffice to say as to this assignment that we think the jury would understand that the instruction referred to such "brakes and braking system" which plaintiff's testimony tended to prove operated inefficiently; and conversely that the jury would not understand that "brakes and braking system" used conjunctively included the brakes which under the evidence apparently operated properly. Furthermore, defendant in instruction 3 used the same language, viz., "brakes and braking system" in directing a verdict for defendant; and defendant offered no instruction designed to make certain that the "brakes and braking system" referred to was the automatic, as distinguished from the engine, brakes.

■ Defendant also attacks instruction 1 because "it failed to require the jury to find a violation of the Safety Appliance Act." As noted, the instruction required the jury to find that what plaintiff did as to brake application would have stopped the train short of the collision point if the brakes had operated efficiently and that plaintiff did the hypothesized acts but that the train failed to slow and stop prior to the collision point. Thus the jury had to find that the brakes failed to operate efficiently to stop the train.

Such a finding, under the circumstances (particularly where plaintiff and defendant insisted that the sole question was whether the brakes worked), was tantamount to a finding that the brakes were defective. The sections of the Safety Appliance Acts pertaining to the train brakes system, 45 U.S.C.A. §§ 1, 9, have been construed by the U. S. Supreme Court as commanding "railroads not to run trains with defective brakes." Coray v. Southern Pacific Co., 335 U.S. 520, 522, 69 S.Ct. 275, 276, 93 L.Ed. 208, 210. It would seem to follow that the jury, by finding in effect that defendant operated a train with defective brakes, found that defendant violated a provision of one of the Safety Appliance Acts. In O'Donnell v. Elgin, Joliet & E. R. Co., 338 U.S. 384, 70 S.Ct. 200, 206, 94 L.Ed. 187, 194, the court said: "As to the claim based on the Safety Appliance Act, we hold that the plaintiff was entitled to a peremptory instruction that to equip a car with a coupler which broke in the switching operation was a violation of the Act, which rendered defendant liable for injuries proximately resulting therefrom, and that neither evidence of negligence nor of diligence and care was to be considered on the question of this liability." Instant jury found that defendant equipped its train with air brakes which did not work properly when applied in a manner in which they would have worked properly had they not been defective. This, according to the U. S. Supreme Court, was a violation of the Act. The assignment is ruled against defendant.

■ Defendant contends that instruction 8 was erroneous. The instruction told the jury to "assess plaintiff's damages at such sum as you find from the evidence will be fair, adequate and reasonable compensation for: * * *

"*Third*, such wages and earnings which plaintiff lost, if you so find, since the date of his accident, and such wages and earnings which plaintiff is reasonably certain to lose in the future, if you so find, as a result of those injuries, if any."

· Defendant says the expression above, "such wages and earnings which plaintiff lost" could mean only his wages as a locomotive engineer and that the undisputed evidence showed that plaintiff was discharged by defendant about a month after the accident and thus the loss of wages or earnings thereafter was due to his discharge; that plaintiff's lost wages were recoverable, if at all, in an action against defendant for wrongful discharge.

One reason why we cannot agree with defendant is that the contention fallaciously assumes that the language of the instruction directed the jury to assess as part of plaintiff's damages the amount of money plaintiff would have earned to trial time if he had remained in defendant's employ as an engineer during that period. The instruction did not so direct. It did not specify that the lost wages, if any, were to be fixed in any particular sum. It left to the jury the question of whether plaintiff had lost or would lose wages and earnings as a result of his injuries. Plaintiff, without objection, offered evidence of his past earnings, the permanency and effect of his injuries and of his life expectancy. Defendant adduced evidence to the effect that plaintiff was only temporarily disabled because of his injuries and some evidence from which, at best, only an inference might have been drawn that plaintiff had been discharged for cause. Defendant went no farther in its proof on the question of whether plaintiff would have or could have continued as an engineer, but for his injuries. It was for the jury to determine from all the evidence whether plaintiff had lost and would lose wages *as a result of his injuries,* and in the absence of any attempt by defendant to limit or clarify the effect and meaning of the language used, we may not say that the instruction as given directed the inclusion of past and future lost earnings not proximately caused by plaintiff's injuries.

■ In examining defendant's contention that the judgment is excessive, we view the evidence as to plaintiff's injuries from a standpoint favorable to him and ignore defendant's contrary evidence.

Plaintiff was 61 when injured with a life expectancy of 13.47 years. He had

been in good physical condition. Shortly after the collision, plaintiff experienced "an awful pain" in his back and, later, pains in the back of his head (caused by having been struck on the head during the accident), over his right eye, in his left elbow, and in his left leg. About 40 minutes after the collision, he was taken by ambulance to a hospital where he remained for 12 days. His back, elbow and over-eye pains continued and, after plaintiff had been 2 or 3 days at home, defendant sent him to its Topeka hospital where he stayed for 6 days, during which time plaintiff's back, elbow and head continued to pain him. The worst pains were in his back and head. He left the hospital on Feb. 6, 1951, and has had no hospitalization since. On Feb. 16, he was notified that he was "fired." His medical treatment since Feb. 6, 1951, apparently has been limited to the wearing of an orthopedic belt, sometimes taking dramamine to relieve dizziness, and "a lot of medicine" plaintiff said was prescribed by one of his doctors. He had earned nothing since the accident because "I am not able to work." At trial time, he still had "bad pains" in his back, continuous headaches, the hearing in his right ear seemed diminished, and he experienced pains in his shoulders and neck when he turned quickly.

His earnings as defendant's engineer for 1950 were $6,200.37; for 1949, $6,389.62; and for 1948, $6,227.50. Plaintiff proved no medical or hospital expense.

Dr. Robert E. Votaw, an ear, nose and throat specialist, saw plaintiff on May 2 and 3, 1951, and Feb. 1, and June 14, 1952. At the first examination, plaintiff complained of dizziness and noises in the right ear. The doctor found an inflammatory disturbance of the right external ear canal evidenced by a redness of the canal and a dry secretion in the ear. The dizziness was due to an inner ear disturbance demonstrable by certain performed tests. A moderate (22%) amount of hearing loss was attributable to exposure to loud noises, and known as "occupational deafness." The external ear inflammation improved rapidly with treatment. In Feb. 1952, the external ear inflammation had subsided;

there was a healed perforation in the interior of the ear drum. Plaintiff still complained of hissing noises in the ear and dizziness on changing positions or stooping. The dizziness was again demonstrated by tests. His inner ears were hyperactive and he had a "spontaneous nystagmus," a movement of the eyeball (uncontrollable by the patient) on looking to the left. This indicated disturbance in the inner ear. Dramamine was prescribed in an attempt to relieve the dizziness.

By June, 1952, there had been a slight decrease in hearing in the left ear. When plaintiff was active the hissing noises remained the same but were less when he was quiet. The dizziness, again demonstrated, was essentially the same. Both ears were sensitive and abnormally active and either one could cause the dizziness. It was the doctor's opinion that, in all probability, the inflammatory change in the right external ear, the dizziness and the hissing sound were the result of trauma and that all this was related to a severe head injury involving the inner ears and perhaps also involving an injury to the central nervous system. The doctor was of the opinion that the hissing and dizziness would continue for some time—just how long being purely speculative.

(Plaintiff did not testify at the trial as to dizziness and the hissing sound in his ear as being among his "present complaints.")

Dr. Dan Tucker Miller saw plaintiff 8 times. In May, 1951, plaintiff complained of back pain, headaches, dizziness and hissing noises in his right ear and loss of weight. He experienced difficulty in getting about, his back was stiff. In Dr. Miller's opinion, plaintiff's back pains were caused by the fracture of two transverse processes of the 2nd and 3rd left lumbar vertebrae. Both fractures had healed in good position by May, 1951. Tests were indicative of the involvement of the central nervous system. He had changes in the deep reflexes in the lower part of his body, including a jerking in the abdomen, and on tapping of the knee, fibrillary jerking of the back muscles; he complained of pain on

tapping of his back, his left leg could not be raised in the leg-raising test without pain, and he had pain on rotation of his neck. Between the first and the last of the 8 examinations, plaintiff became definitely weaker and lost 23 pounds. X-rays showed slight irregularities in the spine and arthritic spurs; the hypertrophic arthritis existed before the accident. It was the doctor's opinion that plaintiff actually experienced the pain of which he complained; that such pain will continue; that plaintiff is permanently incapacitated from doing manual labor of any kind long enough to hold a job and that plaintiff's disability resulted from the accident.

Dr. Francis M. Barnes, Jr., a specialist in nervous and mental diseases, saw plaintiff on May 2, and Nov. 28, 1951, and on Feb. 1 and June 13, 1952. The examinations were made to determine whether there was any injury to, or pathology of, the nervous system. Plaintiff's gait was abnormal, he held his body, head and neck in a "stiff" position; he wore an orthopedic support about his trunk and hips; there was marked muscle spasm in the lumbar region of the back; the knee and ankle reflexes were greater on the left, indicating an abnormal condition in the nervous system; deep conduction tests showed sensory disturbance in the left leg below the knee, indicating a disturbance of "nerve impulse"; and he was hypersensitive to ordinary stimuli. These conditions were due to the accident and were permanent with a possible variation in some details. Plaintiff will continue to have pain. Plaintiff is "totally incapacitated from any manual labor in a competitive market over a continuous period." Plaintiff has "gotten worse" and has lost weight continuously.

Dr. Robert M. O'Brien, an orthopedic surgeon, defendant's witness, testified that the hypertrophic changes in plaintiff's back, as indicated by X-rays taken in Feb. 1951, were "fairly severe" and that plaintiff "might have difficulty doing manual labor" on account of the arthritis; that the arthritic changes themselves are not disabling. One has arthritis after an injury or an infection temporarily aggravates the arthritic condition in the back; in a certain time the arthritic condition should return to the same condition which existed prior to the aggravation.

The jury's verdict was $65,000. Plaintiff remitted $20,000. Is the $45,000 judgment excessive?

Plaintiff, to support his answer in the negative, cites Warning v. Thompson, Mo.Sup., 249 S.W.2d 335, 30 A.L.R.2d 1176; Cruce v. Gulf, M. & O. R. Co., 361 Mo. 1138, 238 S.W.2d 674; and Tatum v. Gulf, M. & O. R. Co., 359 Mo. 709, 223 S.W.2d 418. Those cases involved more extensive, more serious, and essentially different, injuries than those in the instant case; such cases are, therefore, not especially helpful.

We have examined the Missouri cases cited by defendant, viz., Weisman v. Arrow Trucking Co., Mo.App., 176 S.W.2d 37; Hillis v. Home Owners' Loan Corp., 348 Mo. 601, 154 S.W.2d 761; and Curry v. Thompson, Mo.Sup., 247 S.W.2d 792. We have examined cases not cited, such as Hilton v. Thompson, 360 Mo. 177, 227 S.W.2d 675; Abernathy v. St. Louis-San Francisco Ry. Co., Mo.Sup., 237 S.W.2d 161; Hayes v. Wabash R. Co., 360 Mo. 1223, 233 S.W.2d 12; and Pinter v. Gulf, M. & O. R. Co., 362 Mo. 887, 245 S.W.2d 88. We have considered all these cases, particularly Curry v. Thompson, supra, and Hilton v. Thompson, supra. We have taken into account the fact that the trial court examined the question of excessiveness and required a substantial remittitur. We have given effect to changing economic conditions. We have considered the nature, extent and permanency of plaintiff's injuries and disabilities, his pain and suffering, his age and life expectancy, his probable past and future loss of earnings. Recognizing the difficulty involved in attempting to determine the question, we are of the opinion that the maximum amount for which a judgment should stand in this case is $35,000. If, therefore, plaintiff will within 15 days from the date hereof remit here the sum of $10,000, a judgment for $35,000 will be affirmed as of the date of

the original judgment; otherwise the cause is remanded for a new trial.

VAN OSDOL and LOZIER, CC., concur.

PER CURIAM.

The foregoing opinion by COIL, C., is adopted as the opinion of the court.

HOLLINGSWORTH and DALTON, JJ., and HYDE, P. J., concur.

CONKLING, J., dissents.

CONKLING, Judge (dissenting).

Believing that plaintiff was negligent in increasing the speed of his train after it passed automatic signal 5652, which was then showing a yellow light, and also believing plaintiff was negligent in failing to set the emergency brakes on his train immediately after he had made an air reduction when 500–1000 feet west of automatic yellow signal 5632, and believing plaintiff's negligence was the sole proximate cause of his injuries, I respectfully dissent from the principal opinion.

Under the circumstances appearing in this evidence I think it was the personal duty and obligation of plaintiff to have proceeded east of automatic signal 5652 only with caution, at a restricted speed, and to have refrained from increasing speed above the 20 or 25 miles an hour at which the train passed signal 5652. It is my view of all this evidence that plaintiff could have avoided this collision if he had refrained from increasing the speed his train had at signal 5652.

Adopted as the opinion of the court en Banc.

HYDE, HOLLINGSWORTH, DALTON, LEEDY, JJ., concur.

BENNICK and CAVE, Special Judges, concur.

CONKLING, C. J., dissents in opinion filed.