Thomas VAN NORMAN, Respondent,

v.

ILLINOIS CENTRAL RAILROAD COMPANY, Appellant.

No. 46666.

Supreme Court of Missouri,

Division No. 1.

Jan. 12, 1959.

Rehearing Denied Feb. 9, 1959.

Arnot L. Sheppard, Gentry, Bryant & Sheppard, St. Louis, for appellant, Joseph H. Wright, Herbert J. Deany, Chicago, Ill., of counsel.

Hubbell & Mattes, and Walter A. Raymond, Kansas City, for respondent.

VAN OSDOL, Commissioner.

Plaintiff, Thomas Van Norman, instituted this action under the Federal Employers' Liability Act (45 U.S.C.A. § 51 et seq.) for personal injuries alleged to have been sustained when plaintiff, employee of defendant Illinois Central Railroad Company, was being transported in a railroad motorcar in connection with his employment and was thrown to the roadbed and injured when the motorcar was derailed by a closed switch in defendant's yards at Laurel, Mississippi. A jury returned a verdict for plaintiff awarding $62,400 damages. Defendant has appealed from the ensuing judgment.

At the place in defendant's yard at Laurel where the north end of defendant's house track connects by a switch with the main line, there is a switch stand or standard six feet high a few feet east of the main line, which standard bears a red, arrow-shaped vertical target two feet high and one foot wide. In a northbound movement of a railroad motorcar (or train of cars) on the house track toward the switch at the main line, if the flat side of the target is displayed to the operator of the motorcar it is indicated that the switch points of the switch are so aligned that the motorcar can move onto the main line. But if the edge or profile of the target is displayed to the view of the operator in such northbound movement, it is indicated that the switch points are aligned "against" the movement of the motorcar with flanged wheels from the house track onto the main line. When the switch points are so aligned "against" the stated northbound movement, the west switch point is in contact with the west rail of the main-line track and the east switch point is not in contact with the east rail, and traffic may not move from the house track onto the main line. And if such a northbound movement were continued to and into the switch with switch points so aligned there would be a likelihood of derailment because there would be no space through which the flanged left wheels of

the motorcar could pass onto the west rail of the main-line track.

At 7:30 in the morning of March 11, 1955, defendant's assistant foreman Barlow and members of a paint crew including plaintiff had loaded the motorcar with ladders, brushes and paints preparatory to moving through the house-track switch onto the main line in proceeding to their place of work. Barlow and plaintiff and the other members of the crew had taken their regularly assigned seats on the motorcar. Plaintiff was seated with his face to the rear. He was the "lookout" man to protect the crew and motorcar against movement of traffic from the rear.

In operating the motorcar, the operator "always keeps his eyes on the front, looking for open switches or closed switches * * * if the switch points are aligned against the motor car as he approaches the switch * * * he is supposed to stop and get off and line the switch point(s) where you can bear into the other track."

The northbound movement on the house track started at a point approximately 1,000 feet south of the house-track switch.

There was substantial evidence introduced tending to show that when the motorcar was operated in northbound approach to the switch, the edge or profile of the target on the switch stand was exposed to the view of the operator from a distance of as much or more than three hundred feet; that the target, displayed in profile, correctly indicated the fact that the switch points were closed against the northbound movement of traffic through the switch onto the main line. However, the operator did not stop the motorcar in safety short of the switch. The motorcar was derailed, and plaintiff was thrown violently to the roadbed and seriously injured.

 Herein upon appeal, defendant-appellant has contended error in the giving of plaintiff's verdict-directing Instruction No. 1. But our examination of the transcript on appeal shows that defendant, in its motion for a new trial, did not assign error of the trial court in giving any instruction. The two (only) assignments in defendant's motion for a new trial pertained to excessiveness of the award. In this situation we shall not consider contentions of error in instructing the jury in the face of the mandatory rule that allegations of error, "in order to be preserved for appellate review, must be presented to the trial court in a motion for new trial (with stated exceptions) * *." Section 512.160, subd. 1 RSMo 1949, V.A. M.S.; Supreme Court Rule 3.23, 42 V.A. M.S. 30; Brock v. Gulf, M. & O. R. Co., Mo.Sup., 270 S.W.2d 827. However, in defendant-appellant's brief we have observed it is contended plaintiff had not made out a case submissible to the jury, and defendant in effect requests that we review this question under Supreme Court Rule 3.27, 42 V.A.M.S. 31. Upon such request, we review the question under Rule 3.27, although a defendant did not file a motion for a directed verdict at the conclusion of all the evidence (or filed a defective one), and did not direct the trial court's attention to this question in any after-trial motion, because, if a plaintiff has failed to make a submissible case, to permit his judgment to stand would be usually, if not always, a plain error affecting substantial rights and usually, if not always, would result in manifest injustice. Millar v. Berg, Mo.Sup., 316 S.W.2d 499.

 Defendant urges that no substantial evidence was introduced tending to show facts assertedly essential to plaintiff's case. It is said there was no evidence introduced tending to establish whether or not the motorcar was equipped with any kind of stopping device; and if it was so equipped, whether or not it was working properly; and if it was so equipped and if it was operating properly, the distance within which the motorcar could be stopped at various speeds. And also it is said that indeed there was no evidence introduced tending to show the speed at which the motorcar was moving at any time from

the time it started until the casualty occurred.

Specifically, plaintiff had alleged defendant's employee, operating the motorcar carelessly and negligently, failed to stop the motorcar before its wheels struck the switch points and thereby avoid a derailment and plaintiff's injury when the employee knew or by the exercise of due care should have known that the switch points were aligned against the house track and that a failure to stop would likely derail the motorcar and injure plaintiff. The alleged negligent act of omission here—the negligent failure to stop—which allegedly caused plaintiff's injury was a simple one. We discern no material difference here from a charge of a negligent act of commission—"did carelessly and negligently run into" a switch. Compare Jenkins v. Wabash R. Co., 335 Mo. 748, 73 S.W.2d 1002. See also Jones v. Central States Oil Co., 350 Mo. 91, 164 S.W.2d 914. As we see it, the petition charged a specific but simple violation of defendant's duty to plaintiff, an employee, who was being transported in connection with his employment, to exercise ordinary care for plaintiff's safety. This duty included the obligation to exercise ordinary care to prevent a derailment. Jenkins v. Wabash R. Co., supra; Lloyd v. Alton R. Co., 348 Mo. 1222, 159 S.W.2d 267. See also Sandri v. Byram, 6 Cir., 30 F.2d 784.

We think the evidence supporting the allegation of failure to stop in violation of the shown duty to stop in the shown circumstances of this primary negligence case carries the permissible inferences of negligence and of causation linking the act of omission with plaintiff's injury. In our opinion the evidence was sufficient in justifying the submission of plaintiff's case to the jury. As noted, plaintiff had introduced evidence substantial in tending to show that the operator of the motorcar had the duty of keeping a sharp lookout for closed switches, and when the switch points of a switch were aligned against the motorcar, the operator "is supposed to stop

* * *." The evidence was substantial in showing the switch was closed for traffic from the house track onto the main line and that the operator failed to stop with resultant derailment and injury to plaintiff. We believe that here it was not essential to specifically show the rate of speed at which the motorcar was moving or to show the distance within which the motorcar could have been stopped when moving at various speeds or at any particular speed, or to show that the motorcar was equipped with a stopping device or that the stopping device was in good working order.

■■ There was evidence that the operator had the duty to stop when confronted by a closed switch, and it may be readily inferred therefrom that the motorcar was or should have been equipped with a stopping device or brakes. And, absent evidence to the contrary, it is to be assumed that defendant was not negligent in failing to provide a stopping or braking device in efficient order. Allen v. Kessler, Mo.Sup., 64 S.W.2d 630. In this primary negligence case, the operator had moved from approximately 1,000 feet northwardly over the house track toward a known hazard of a possible derailment at a switch of known location through which switch the operator contemplated the motorcar was to pass. His was the duty to exercise ordinary care to stop the motorcar, if the switch was closed, and thus to avoid a derailment. Now we believe it reasonable to say that the operator, having the duty to exercise ordinary care to avoid a derailment of the motorcar and injury to plaintiff by stopping the motorcar, was obliged, in such exercise of ordinary care, to have the motorcar under such control as to speed and movement in its approach to the switch that he, when by looking was able to see the switch and target, could stop the motorcar, with whatever stopping device the motorcar was equipped, and at a point safely short of the danger. By this we mean to say that implicit in the duty of the operator to exercise ordinary care to stop, and thus avoid a known hazard of a derailment, was the

obligation of taking commensurate precautions, antecedent to the time of the immediate danger of derailment, to proceed in approaching the switch by looking and by regulating the speed and operation of the motorcar in such a manner as to be able to stop after, in looking, he saw or should see the switch was aligned "against" the movement. Compare Adkins v. Boss, Mo. Sup., 290 S.W.2d 139, in which a plaintiff's contributory negligence was considered; and see Creech v. Blackwell, Mo.Sup., 298 S.W.2d 394, id., Creech v. Blackwell, Mo. Sup., 318 S.W.2d 342; Cooksey v. Ace Cab Co., Mo.Sup., 289 S.W.2d 40.

Here we confidently say the "proofs justified with reason the jury's conclusion that employer negligence played a part in producing" plaintiff's injury. Moore v. Terminal R. Ass'n of St. Louis, 79 S.Ct. 2.

And we are all the more confident the result we have reached here is the correct one because we think our view on the question of the submissibility of plaintiff's case formerly must have been shared by able counsel for defendant in this case where the transcript on appeal shows that, while defendant did not formally admit liability, it, nevertheless, in participating in the trial, conducted its defense in a way calculated to indicate to the judge of the trial court and to opposing counsel that the issue of liability was not contested; did not file a motion for a directed verdict at the conclusion of the case; did not file any after-trial motion directed at the question of the submissibility of the case; and only here, in its brief upon appeal, requests this court's review of the question under Rule 3.27.

■ Was the award, $62,400, excessive? In examining this question, we consider the evidence relating to the nature and extent of plaintiff's injuries from a standpoint favorable to plaintiff.

■ Plaintiff, at the time of trial, was 28 years old. He had attended school less than half the time to "the fifth grade"; and now can read and write "hardly at all." He had earned a little over $300 per month, but has not received any income since February, 1956. At the time of trial he had lost approximately $5,400 in wages.

When the motorcar was derailed, plaintiff was thrown from the car and landed on his buttocks. He immediately experienced sharp, knifelike pains in the lower back. He worked the rest of the day, and at the regular quitting time, 4:00 p. m., went to his home and lay down until suppertime and, after supper, went to bed. He continued to work for defendant for about eleven months, the while suffering pain of increasing severity in his lower back and left leg.

In the fall of 1955, plaintiff consulted a physician in defendant's employ, and was given salve and pills. In February, 1956, plaintiff again consulted the doctor, who sent plaintiff to defendant's hospital in New Orleans. From February to May, 1956, plaintiff was hospitalized four times aggregating over eight weeks. He was complaining of pain in the low back and left leg. X-rays were taken; heat therapy and pills were prescribed; and plaintiff was required to "sleep on a board." Plaintiff was transferred to and hospitalized in defendant's hospital in Chicago for about two months. While there, plaintiff was X-rayed, given myelogram tests, heat therapy, pills, and again required to sleep on a board. It was ascertained that plaintiff had suffered the rupture of discs between the vertebrae—3d and 4th lumbar; 4th and 5th lumbar; and between the 5th lumbar and the lumbo-sacral joint. The three discs were removed surgically in June, 1956, by an operation of approximately two and a half hours' duration. After his discharge from the hospital, plaintiff used crutches for about a month and a half, a cane for four or five months, and "ever since" has been required to wear a canvas brace with steel ribs. Plaintiff now has pain in his low back "like a toothache," and when he stoops, stands, or walks, or sits in one position too long the pain gets

sharper. Pain is also experienced in the left leg and heel. His left foot feels asleep, and he walks with a limp. The pain, the abnormality, and the paresthesia in the lower left extremity are said to be due to pressure against and some severance of the several components or nerve roots of the sciatic nerve, which nerve roots come out of the spine in the lower back. Plaintiff must lie down about an hour in the morning and in the afternoon of each day. Plaintiff now has a back with marked limitation of movement—he has restrictions in all back motions—and a lame left leg with paresthesia. He walks with a decided limp; the lateral part of his left foot strikes the floor; and there is limitation of dorsiflexion. A physician is of the opinion that plaintiff is permanently disabled for physical and manual labor, and is permanently disabled for any regular employment. It is a safe assumption that one would have a "worse condition" when three herniated discs have been removed than had there been but one.

The cases cited by the parties have been examined to ascertain if comparable injuries, in nature and extent, have been considered by this court on the question of excessiveness. Cases found to be helpful to us on this question are Hayes v. Wabash R. Co., 360 Mo. 1223, 233 S.W.2d 12, decided in 1950, in which plaintiff Hayes was awarded $55,000 by the jury and the trial court required a remittitur of $10,000, and the reduced award was further reduced by remittitur required by this court to $37,500; Dempsey v. Thompson, 363 Mo. 339, 251 S.W.2d 42, decided in 1952, in which the jury's award was reduced by remittiturs in the trial court and here to $37,500; and Votrain v. Illinois Terminal R. Co., Mo.Sup., 268 S.W.2d 838, decided in 1954, in which case the jury's award of $75,000 was reduced in the trial court and here to $35,000. See also the nature and extent of injuries recited in the cases cited in the Votrain case, 268 S.W.2d at page 847, wherein awards have been approved in amounts from $25,000 to $50,000. This court in the Dempsey case, cited supra, states injuries which, although possibly less in extent, are fairly comparable to those sustained by plaintiff Van Norman, although plaintiff Dempsey, at the time of his trial, was older, but seems to have had more education and versatility of experience indicating the possibility that Dempsey was more capable than is Van Norman of changing over to some wage-earning work not involving physical activity.

Considering the awards allowed in the cited cases, particularly in the Dempsey case, in our recognition of the desirability of reasonable uniformity of awards, we have the opinion the award in the instant case is excessive in substantial amount. However, we have noticed the constant depreciation in the buying power of the dollar in the several years since the Dempsey decision and, taking this into account, with the other facts to be considered upon the issue of the excessiveness of an award, we believe the jury's award in the instant case should be held excessive in the amount of $15,000.

If, within fifteen days, plaintiff enters a remittitur of $15,000, the judgment should stand in the amount of $47,400 as of the date of original rendition; otherwise, the judgment should be reversed and the cause remanded.

It is so ordered.

COIL and HOLMAN, CC., concur.

PER CURIAM.

The foregoing opinion by VAN OSDOL, C, is adopted as the opinion of the court.

All of the Judges concur.