EUGENE T. SENSENEY v. LANDAY REAL ESTATE COMPANY, a Corporation, Appellant.—131 S. W. (2d) 595.

Division One, September 14, 1939.*

*NOTE: Opinion filed at May Term, 1939, July 7, 1939, motion for rehearing filed; motion overruled at September Term, September 14, 1939.

*Anderson, Gilbert, Wolfort, Allen & Bierman* and *Sullivan, Reeder & Finley* for appellant.

*Eagleton, Waechter, Elam & Clark* for respondent.

130

HYDE, C.—This is an action for damages for personal injuries sustained by falling into an elevator shaft where plaintiff opened the door to use the elevator. Plaintiff had a verdict for $29,505.75. Defendant has appealed from the judgment entered.

Defendant assigns as error the refusal of the court to sustain its demurrer to the evidence. Defendant contends that plaintiff was not entitled to recover both because there was a failure to show any actionable negligence of defendant, and because the evidence showed that plaintiff was guilty of contributory negligence as a matter of law. Therefore, the facts are hereinafter stated as shown by the evidence considered most favorably to plaintiff. There is much in the briefs on the question of whether plaintiff, in his use of the elevator, was an invitee or a licensee. Because of the view we take, we consider this immaterial.

Defendant owned, maintained and operated a four-story office building, known as the Lister Building, located at the southwest corner of Taylor and Olive Streets, in the City of St. Louis. The offices in the building were let, principally to physicians and dentists. The building was open to the public daily from 8 A. M. to 9 P. M., excepting Sundays and holidays, when it was open to the public from 8 A. M. to 3 P. M. During these hours, defendant provided elevator service to its tenants and the public by regular elevator operators. When the building was closed to the public, defendant's only representative in the building was a negro janitor by the name of Bishop, who lived in the basement of the building. The main entrance to the building consisted of a pair of swinging "storm doors,"

which were never locked, and an "inner door," locked when the building was not open to the public, opening into the first floor lobby. Defendant furnished tenants with keys to the "inner door," because of physicians' and dentists' business requiring access to their offices at all times. In the east part of the rear (south side) of the lobby, there was a passenger elevator in an enclosed shaft, with an entrance door from the lobby to the elevator. In the west portion of the rear of the lobby there was a stairway leading upward, toward the south, to the second floor. Between the passenger elevator shaft and the stairway, about in the center of the rear of the lobby, there was a passageway leading south from the lobby proper to the entrance of a freight elevator. On the east wall of the lobby, about three feet north of the entrance door to the passenger elevator, there was a large mail box with a mail chute coming down into it from the upper floors. The top of this mail box was about six feet above the level of the lobby floor.

On each floor of the building there was an entrance doorway in the elevator shaft in the same relative position as that in the lobby on the first floor. The doors on the four upper floors were all alike, except that there was a round hole, referred to as a "keyhole" in the first floor (lobby) door, about five-eighths of an inch in diameter. These doors, opening into the elevator shaft, on all four floors of the building were seven feet high, approximately half that wide, and of solid metal, except for a small diamond-shaped glass panel in the center of the door, about five feet above the floor level. These doors were opened, from inside the elevator shaft, by means of a bar and hinge arrangement which caused them to slide, from the opening in the east part of the north wall of the shaft, toward the west. They closed, "automatically." There was no means of opening the doors on the three upper floors of the building, except from within the elevator shaft. The first floor (lobby) door could be opened from outside the elevator shaft by a person in the lobby, by inserting what was referred to as a "key" (in fact, a metal rod about three-eighths of an inch in diameter and one foot long) through the keyhole in the door, and pressing downward, so as to raise the bar on the inside of the door. This would "break" the hinge arrangement, and open the door sufficiently to permit the insertion of the person's fingers between the east edge of the door and the door frame. When the "key" was withdrawn from the "keyhole," the door could be pulled, or slid, open by hand. Of course, this door could have been opened with any other metal rod of the same size and length. This "key" was kept in the elevator cab by the operator when the elevator was being used during the time the building was open to the public; and, after regular hours, when the operator had gone, this "key" was kept on top of the mail box in the lobby. Whenever a person operating the elevator desired to leave it at one of the three upper floors, it was neces-

sary to use some means to keep the door on that floor open, in order to prevent the door from "automatically" closing and thereby preventing access to the elevator cab. The door was generally held open by wedging the "key" in the floor slot in which the door moved back and forth. Inside the cab of the elevator, there was an electric light, controlled by a switch button located at the west side of the front (north) wall of the elevator cab, and it was necessary to be inside the elevator cab to turn this light switch. When the elevator was not in use, the electric light in the elevator cab was kept turned off. The edge of the floor of the cab (when at the first floor) came within "about an inch and a quarter" of the "landing, on the outside" in the lobby.

When tenants of the building would come in it to go to offices on the upper floors after regular business hours, it was customary for them to call for Bishop, and, if he was located, he would operate the passenger elevator to take them to and from their offices. If Bishop was not available, sometimes tenants used the stairway, and at other times operated either the freight or passenger elevator. This use and operation of the elevators by the tenants was neither specifically authorized nor specifically prohibited, but it was known to Bishop. Plaintiff was a physician, and for twenty-seven years had his offices on the third floor of defendant's Lister Building. During the entire period of his tenancy, it had been plaintiff's practice, when going to and from his office in the building after regular hours, and when he did not intend to remain in his office any length of time, to use and operate the passenger elevator himself, if he could not locate Bishop to take him up and down on it. He had done this with the old elevator prior to 1930, and with the new one installed at that time. If plaintiff intended to stay in his office any length of time on these occasions, he would use the stairway instead of the elevator. Bishop knew that plaintiff thus used and operated the elevator at least as frequently as once a month. On some occasion, when plaintiff undertook to use the elevator after regular hours, he found the key gone from the top of the mail box, and, on those occasions, he would use the stairway to reach his office; but when he found the key on top of the mail box, he used it to open the door so as to use and operate the elevator himself. Bishop said that, when he had his overalls on, he carried a screw driver in his pocket, and used it to open the elevator door.

Plaintiff was injured on Sunday, September 1, 1935, about 3:30 P. M. He called twice from the lobby for Bishop, but got no response. He did not press the button which would sound the buzzer in the elevator cab. He looked through the diamond-shaped window of the elevator shaft door "to see whether or not the elevator cab was there," but "it was just dark" so that he did not see anything. He took the key from the top of the mail box, "put it in the hole in the

middle of the door and pried down." This released the latch and caused the door to open so that he could take hold of it with his left hand. He took the key out, moved the door to his right, and then used his right hand to fully open it. He said: "I had it open and looked in and thought I saw the elevator and stepped in to turn on the light in the elevator. . . . I kept on going." He further testified that "it was a gloomy day and it wasn't very bright in there;" that he "could distinguish objects in there;" that the only artificial light "was a light back in the freight elevator;" that the light on the newel post of the stairway and the lights on the lobby ceiling were not turned on; but that he saw the keyhole in the elevator door and had no trouble "getting that key in the hole." Plaintiff also said: "I didn't know there was but one key; that is all I ever saw." A few minutes before plaintiff was injured, Bishop had taken the elevator from the lobby landing to the third floor landing. Bishop had entered the elevator from the lobby, by using the blade of his screwdriver to insert in the "keyhole" of the door, instead of using the "key" on the mail box. After thus opening the door, Bishop entered the cab of the elevator and turned on the light in the cab, the door to the elevator closing automatically. Bishop then moved the elevator to the third floor level, where he wedged the shaft door open with the screwdriver, and went about his work of turning off the lights in the west end of the hall.

The negligence of defendant claimed boils down to the charge that it was "negligence for the defendant (acting through Bishop) to have moved the elevator from the first floor level when the rod or key was on the mail box, or, vice versa, to leave this rod or key on the mail box when the elevator was moved to some other level." Because of the view we take, it is unnecessary to determine whether or not this could be actionable negligence. In Bonanomi v. Purcell, 287 Mo. 436, 230 S. W. 120, this court ruled a similar case on plaintiff's contributory negligence, as did the Kansas City Court of Appeals in Cox v. Bondurant, 220 Mo. App. 948, 7 S. W. (2d) 403, certiorari quashed, State ex rel. Cox v. Trimble, 312 Mo. 322, 279 S. W. 60. [See, also, Keeter v. Devoe & Raynolds, 338 Mo. 978, 93 S. W. (2d) 677; Shuck v. Realty Bldg. Co. (Mo. App.), 201 S. W. 559; Katz v. North Kansas City Development Co. (Mo. App.), 14 S. W. (2d) 701 (holding recovery depended upon who opened door); Ann. Cas. 1914C, 581 note; 45 C. J. 949, sec. 507; 18 Am. Jur. 550, sec. 51.] Plaintiff cites Kennedy v. Phillips, 319 Mo. 573, 5 S. W. (2d) 33; McCloskey v. Salveter & Stewart Inv. Co., 317 Mo. 1156, 298 S. W.226; Baldwin v. Hanley & Kinsella Coffee Co., 202 Mo. App. 650, 216 S. W. 998; Grote v. Hussmann, 204 Mo. App. 241, 223 S. W. 129; Fox v. Missouri Jobbing House (Mo. App.), 32 S. W. (2d) 130. In none of these cases, did the person, who fell into the shaft, open the door himself at the time he entered. In several

of them, the injured person fell into an unguarded shaft in the dark at a place where he did not know there was a shaft. Plaintiff argues that "the presence of the key on top of the mail box was the legal equivalent of assurance that the elevator was at the lobby landing, and an invitation to enter the shaft," so that the case is like Grote v. Hussmann, supra, where the operator stood with his hand on the open door "in exactly the same position he would stand when he was ready to take passengers." While this (leaving the key on the mail box) might be construed as an invitation to use the key to open the door, we do not see how it can be considered an invitation, to thereafter enter the shaft without looking to see whether the elevator was there or not. It was obvious to anyone who ever used this key that it was not the only existing instrumentality with which it was possible to open the door. If, as said in the Fox case, an open elevator door is "an invitation to enter," then it seems reasonable to say that a closed elevator door is a warning to look before entering; and that by opening it plaintiff gave his own invitation.

In Cox v. Bondurant, supra, the court pointed out the distinction between guarded (by closed doors) and unguarded (open) elevator shafts in considering the question of contributory negligence. The court said: "Our attention has not been called to a case where recovery was allowed one, even an invitee, who approached an elevator shaft *knowing it to be such,* and which was *closed* by means of guards or doors, and *where he opened those doors* and stepped into the shaft without taking even the slightest precaution to ascertain if the elevator were there." (Our italics.) [A similar statement is made in Wheeler v. Hotel Stevens Co. (Wash.), 127 Pac. 840, Ann. Cas. 1914C, 576.] We know of no good reason why there should be any such case. As this court said in Bonanomi v. Purcell, supra, "the most universal (method of preventing accident) . . . is to 'look where we step.' " Every one has the duty to exercise ordinary care for his own safety and should not expect some one else to compensate him for his injuries when he does not do so. As suggested in the Bonanomi case, "had it been ever so dark a movement of his foot would have determined it" (whether it was there or was not), as would likewise feeling with his hand for the wall of the elevator cage. Plaintiff recognized his duty to determine it because he did look in the window in the door before he opened it. What can possibly be said to excuse him in stepping into the shaft without determining it, after he had looked through this window and could not see it? Saying that he thought he saw the elevator when he opened the door only shows that he did not look with any care, as is the case when one says he did not see a train at a railroad crossing when it was there. Suppose the regular elevator operator arrived in the morning to go to work, found someone waiting to go to another floor, and, because the key was on the mail box (regardless of who put

it there), opened the door and told the person to enter when the elevator was not there (without doing any more than plaintiff did to find out); would there be any doubt about his negligence? Suppose plaintiff was accompanied by a patient and, under such circumstances, told him to enter; should not such patient have a negligence case against him? If a person would be guilty of negligence in allowing some one else to enter the shaft without determining whether the elevator was there, why would he not be negligent if he did so himself? The only conclusion we can reach is that plaintiff was negligent and that his negligence directly contributed to his injury. We hold that plaintiff cannot recover because his own testimony shows contributory negligence as a matter of law. The judgment is reversed. *Bradley* and *Dalton*, *CC.*, concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur, except *Hays, P. J.*, absent.

