JOSEPH S. CASSANO, (Plaintiff) Respondent, v. THE ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY, a Corporation, (Defendant) Appellant, No. 42433—247 S. W. (2d) 786.

Division Two, April 14, 1952.

1208

*Walter R. Mayne* and *F. W. Schwarz* for appellant; *John H. Lathrop* and *Sam D. Parker* of counsel.

*Cox, Cox & Cox* for respondent; *William H. De Parcq* and *Donald T. Barbeau* of counsel.

ELLISON, J.—The plaintiff-respondent brakeman recovered a judgment against the defendant-appellant railroad for $45,000 damages for injuries to his back, which were sustained when he was attempting to release the brakes on a freight car in appellant's freight yards at Belen, New Mexico. The suit was based upon appellant's alleged violations of the Federal Employers' Liability Act, 45 U.S.C.A., § 51, and the Federal Safety Appliance Act, 45 U.S.C.A., §§ 1,2,3, requiring railroad cars to be equipped with sufficient operable power brakes and automatic couplers; and on faulty management of a switching movement in the failure to use them. Appellant denies these charges and alleges they were not the producing causes of respondent's injuries, and should not have been submitted to the jury; and that appellant's medical evidence was insufficient to justify the $45,000 verdict, and calls for a remittitur.

The facts were that about daybreak on the morning of May 21, 1949, a switching crew had left a string of 40 or 50 coupled freight cars with no brakes set on track 19 in the east end of appellant's Belen yard. Presently another crew in the west end of the yard, with their engine headed west, coupled together about the same number of freight cars on the same track. When these two operations were

1210

completed the two cuts of cars were standing 12 or 15 car lengths apart. Then the west engine backed eastward the cars to which it was attached, to couple both strings of cars together. The crews were making up a long freight train with two engines bound for Vaughn, New Mexico. The front engine was to go about half way until the train had crossed over a mountainous region.

After the coupling impact the engine on the west started to pull *all* the cars westerly. But after it had proceeded two or three car lengths a switchman named Garner, who was standing some distance down the track, discovered that the two cuts of cars had failed to couple, and that the east cut was not following the west cut but running loose backward on track 19 toward the east, which was downgrade. Garner started in pursuit of them. Other members of the train crew were riding on two locomotives which were going to take the train out. These engines were coupled together and moving eastward on the next parallel track, number 20. Four of the crew members jumped therefrom and mounted the loose moving cars on track 19 when or after they passed the engines. They put on the brakes and stopped them. The cars were standing on track 19 when switchman Garner overtook them. He testified he found nothing mechanically wrong with the couplers on the two cuts of cars. The reason they didn't couple the first time was that the knuckle on one of the couplers was not open. He said in those circumstances sometimes the cars would couple and sometimes not. When the second effort was made they did couple perfectly. The pin had simply failed to drop in place the first time.

The plaintiff-respondent Cassano was riding on the cowcatcher of the front locomotive. When he discovered the two cuts of cars on track 19 had not coupled, and that the east cut was rolling east and backward downgrade about 6 or 8 miles per hour, he signaled his engineer who stopped his locomotive. Cassano said he got on top of the moving cut of cars on track 19 and started setting the hand brakes. So did Lewis, one of the two conductors, Andrews, one of the two engineers, and a fireman. This stopped the movement of the runaway east cut of cars. Respondent then released the brakes he had set and perhaps one or two more, and some of the other trainmen did the same. The cars were standing still.

Respondent got back on the ground and was returning to his engine. While he was doing this the two cuts of cars had been coupled, and **another engine** was pulling all of them back west past him. After he had walked about two car lengths the last car went by and he noticed the wheels were sliding, making flat places on the treads. It had been the front car when those cars were rolling east—the one on which Lewis, one of the engineers, had set the brakes by turning the brake wheel "very tight" as he said. [He also said he found nothing wrong with the brake.]

There were two ladders at the front right hand corner of that car, one on the side and one on the end. Also on the end, and flush with the roof was a perpendicular brake wheel with a chain and rod descending to the braking apparatus on the car truck below. Under this brake wheel was a lever projecting downward. The brake wheel when turned clockwise would tighten the brakes; counter-clockwise it would loosen them. The lever would completely release them in a single operation. Below the wheel a short distance was a platform on which a brakeman could stand in turning the wheel. But it was much more difficult to operate the lever from the platform because the two were so close together. A photograph of the brake mechanism introduced by respondent as Exhibit B was as follows. It was called a Miner brake.

When the respondent saw the wheels of the car were sliding he climbed up the ladder on the south (right) side and proceeded to release the handbrake. He said he stood with both feet on the little platform, his left hand holding either the ladder or grab iron, and reached down with his right hand and pulled the brake lever (not the wheel). To do that he had to stoop or bend considerably. The lever was tight. He pulled three or four times, harder each time. The

last time the brake released and he had "an awful sensation in his back," a sharp pain as if he had hit the crazy bone in his elbow. He said there was "something wrong with the brake." It was "set too strong." But he admitted he did not report it to the railroad company and didn't inspect the brake afterward, and didn't know why he failed to report it. But in a previous deposition he had said it was because he was "more or less just trying to get out from extra work." And he admitted he didn't miss any (regular?) work until October, 1949, which was over four months later.

On this issue brakeman Garner was recalled as a witness by respondent. The photograph Exhibit B was shown to him. He said he was familiar with that type of brake, and had occasion to operate them about 50% of the time. He stated the lever shown in the photograph was a release lever, and that if a brake is set up good and tight and you want to release it you pull the lever. That is what *he* would do, he said, even though the brakes were set tight enough to make the car wheels slide, and he had never had any trouble or difficulty about it. Then he was asked "if you go up that ladder and take ahold of that release lever and give it a good pull, in your opinion will that release the brake?"—even though the wheels are sliding. He answered in the affirmative and said that would be the normal behavior of the brake if it was in good working order, and the customary and usual way to release it. But in answer to further questions the witness said you can release the brakes either by turning the brake wheel counter-clockwise or by pulling the lever, but if in a hurry you would pull the lever. However these questions were based on the assumption that the brakeman is on the ladder, not on the platform just under the lever.

As stated in the beginning, the appellant railroad denies the respondent's charges that the cars involved here were not equipped with operable automatic couplers and brakes, and maintains the operation of those instrumentalities was not a producing cause of respondent's injuries. First, as to the couplers. When the freight train was being assembled it is true the west and east cuts of cars did not couple on the first impact. But that was not due to any defect in the couplers.

 The only witness who testified on that point was the respondent's witness brakeman Garner. He said the west cut of cars was moving at only about 1-1/2 miles per hour when the attempted coupling was made, and that the reason why the two cuts of cars failed to couple was that the knuckle of the coupler was not open on the front end of the west cut. When a second effort was made soon afterward the cars coupled perfectly. Nothing was wrong with the couplers. The pin on one coupler had simply failed to drop because the knuckle was not open, as sometimes happens. Under these facts no liability was imposed on the appellant under the coupler statute.[1]

 Furthermore, in our view there was no contributory causal

relation between the failure of the two cuts of cars to couple in the first instance and respondent's subsequent injury. True the east cut of cars did run downgrade for that reason. But the trainmen set the brakes and stopped them. Respondent's injury was due to a wholly different subsequent cause. He had left the runaway cars and was walking back to his engine after they had been captured and were being returned to their former position. As they passed him he noted the last car still had the brakes set, and he mounted it to release them. In that effort he was injured by overexertion in attempting to release the brakes. But his counsel argue the strenuity of his effort was induced by excitement aroused by the runaway cars, which in turn was produced by the previous failure of the cars to couple a considerable time before. We cannot stretch the chain of causation that far, and charge his injuries to a violation of the coupler sections of the Federal Employers' Liability Act.

On that point respondent cites the Carter decision, supra.[1] In that case an engine was backing a string of cars to couple with a standing car. The opinion states "both lips of the coupler" on the latter were open but the cars failed to couple and the standing car was kicked down the track. The respondent brakeman pursued and mounted it, and by setting the hand brake stopped it. But the engine and string of cars, then 20 feet away, continued to approach and made a second coupling, which was successful. The impact pitched the brakeman into the hold of the car where the cargo fell on and injured him. The decision held this whole sequence of events established a causal relation between the original failure to couple, the subsequent coupling and the injury, and constituted negligence on the part of the railroad within the meaning of the Federal Employers' Liability Act. 45 U.S.C.A. §§ 51, 53, 54.

We think the facts distinguish this case from the Carter decision, supra, and that the initial failure here of the two cuts of cars to couple had no causative bearing even "in part" on the infliction of respondent's subsequent injuries due to overexertion in endeavoring to release the Miner brake on the last car in the manner shown by his own testimony, after the brakes had been set and the runaway cars stopped without injury to anyone. The emergency had ended and his own acts were the superseding cause of his injury in our opinion. The law of causality permeates the whole universe but obviously it cannot be applied in legal reasoning where the relation between cause and effect is metaphysical or beyond the range of actual causation at least in part.

 The remaining question, on liability, is whether the evidence showed the Miner brake was defective. If it was, respondent was entitled to go to the jury on that issue under the Federal Safety

[1] Affolder v. N.Y.C. & St. L. Rd. Co., 339 U.S. 96, 99, 94 L. Ed. 683, 70 S. Ct. 509; Carter v. Atl. & St. A. B. Ry. Co., 338 U.S. 430, 434, 94 L. Ed. 236, 70 S. Ct. 226; O'Donnell v. Elgin, J & R Ry. Co., 338 U.S. 384, 389, 94 L. Ed. 187, 70 S. Ct. 200.

1214

Appliance Act, 45 U.S.C.A., §§ 1, 3, 7, 11, and the Federal Employers' Liability Act, 45 U.S.C.A. §§ 1, 51. As we have stated the respondent testified that he stood on the little platform a few inches under the brake lever, stooped over with his left hand holding the grab iron or ladder, and with his right hand pulled the lever three or four times, harder each time, until the brakes released and he felt the pain in his back. Something was wrong with the brake: it was set too tight. He had never had similar difficulty with that type of brake before.

Respondent's witness brakeman Garner went further. He testified that if the lever was in good working order it would release the brakes without any trouble or difficulty even though they were set tight enough to make the car wheels slide. He further stated either the brake wheel or the lever would release the brakes, but that the former worked slower and that the latter would be used if haste was necessary. A car inspector, Mr. Ortez, had made a visual inspection of the car from the ground at 2:30 that morning when it arrived in the yards. He did not examine the hand brakes. A witness Roland Olander, called by appellant, testified he was the inventor of the brake and demonstrated with a model how it worked. But he said he could set the brake so tight with the wheel that he couldn't release it with the lever, which tended to corroborate respondent. In view of all this testimony we hold the respondent made a case for the jury on this issue.

■ Appellant's next assignment is that the verdict of the jury for $60,000, as reduced by the trial court to $45,000, was still excessive and should be further reduced. As previously stated, the respondent admitted he continued in his work as brakeman for four months after he received his injury. And he had suffered several previous injuries. He began to work for the railroad in April, 1942, and a few months afterward suffered an injury to his ribs when knocked down in a caboose. A year or two later one of his toes was broken. In 1945 he was injured and developed a hernia in his left groin and underwent a surgical operation in which the right testicle was removed. Also his vermiform appendix had been removed.

None of these, he said, resulted in permanent injury. He had never had an injury to his lower back. He sometimes served as a conductor on passenger trains. His earnings were $5082.13 the last year he worked for the railroad, or $423.15 per month. His age at the time of his injury was 37 years, 1 month and 20 days. His life expectancy was 32.61 years, making his anticipated life earnings $105,588. Appellant makes the point that the annuity tables include many persons engaged in non-hazardous occupations, and does not reflect respondent's true expectancy in his more dangerous job as a freight brakeman and switchman.

As to the medical testimony and the nature of respondent's injury. He had a protruding disc between the fifth lumbar vertebra and the

sacrum, which had been removed by surgery and a bone chip grafted in its place to fuse the vertebra and the sacrum and immobilize the former. At the trial respondent testified his back catches, ▮▮▮ is tired, and the motion limited. He has a tingling sensation in the right foot. The operation had been performed in the appellant's hospital in Albuquerque, New Mexico on November 15, 1949, after respondent had been under treatment by appellant's physicians from October 5 to December 8, 1949, nearly six months after the casualty. The surgeons were Doctors Forbis and McIntire, consultants of appellant's medical staff.

They testified in a deposition taken by appellant that when they first saw respondent, raising his straight leg was moderately limited and painful and only slightly so as to the left leg. There was no loss of sensation in either foot. He said when he worked he had pain in his back, which he had recently re-injured; that his head began to bother him considerably again; that he was unable to bend; that lifting bothered him; and that he had some pain around the lower ribs on the right side, whereas originally the pain was in the low back only. Coughing and sneezing bothered him. After some treatment and the taking of X-ray pictures the operation was performed and respondent was required to wear a belt and take physio-therapeutic treatment. It was the opinion of these doctors that he would be able to return to work, although there would probably be some permanent disability "as there nearly always is with a fusion type of operation, but not sufficient to prevent a man to return to work."

They said his immobility had caused a decrease in the strength of the muscles affected. But one of them also testified he had failed to report for physio-therapeutic exercises, which it was hoped would restore the muscles of the back to their normal strength, as he thought they would. This doctor said he could see no reason why the respondent would not be able to resume work. However he further stated there would most likely be some permanent disability, as there nearly always is, with a fusion type of operation, but not sufficient to prevent a man from working. There was at the time some limitation of motion, but it would not be very great once the muscles have returned to normal. Also the remaining joints of the back tighten up because of immobility over a period of time. After muscular strength is restored there would still be a little limitation of motion through the diffused area.

A St. Louis orthopedic surgeon, Dr. E. C. Holscher, was called as an expert witness by the defendant. He had made physical examination of the appellant and of X-ray photographs taken in St. Louis. He said he considered the respondent's back was functioning quite well and that there was a good solid fusion between the vertebra and the sacrum. He thought some of the respondent's hyper-reactions were illogical and believed his back had been "quite well repaired", and should stand up under work as a brakeman. On cross-examination he admitted finding a decreased jerk on respondent's left ankle and

1216

conceded it was an objective symptom of the back injury respondent had received and he also conceded several other objective symptoms displayed by the patient were indicative of the same trouble.

A psychiatrist and neurologist, Dr. Hillary Unterberg of St. Louis examined respondent on September 28, 1950. He did not see the X-ray pictures but interrogated the respondent extensively and checked thoroughly his nervous reflexes. He conceded a disturbance in sensation in various parts of the body which might be caused by a displaced intervertebral disc, but that some of them might be attributable to a severance of nerves in the spinal operation performed by Doctors Forbis and McIntire. And he concluded "there is inadequate evidence of defect which one would consider disabling in carrying out work as a brakeman." In that connection he pointed out that respondent had continued to work for four months after he was injured.

Dr. E. C. Ernst an X-ray specialist in St. Louis took part of the pictures used in the trial. He said that disassociated from the history of the case, which he did not know, he saw nothing in the pictures that could be interpreted as of a disabling nature except in the fused area of the spine, which "merely probably would slightly limit the motion of the extreme lower portion of the back on flexation and extension." He did not consider it as disabling respondent from engaging in work, though he might be a little stiffer. But on cross-examination he refused to say what he could or couldn't do.

Respondent called three medical witnesses Doctors Levey, an X-ray specialist, Dr. Pernoud, a general surgeon, Dr. Britt, a neurologist and psychiatrist, all of St. Louis and environs. All expressed the professional opinion that respondent would not be able to resume work as a railroad brakeman, or at least should not take the risk of doing so, and should limit himself to lighter activities. One of them said he would continue to suffer pain in any event and that heavy work would increase the pain. Another said he would at least suffer discomfort and should be under medical care and observation in the future. We shall not attempt to summarize in detail the testimony of these three witnesses, which is lengthy.

The verdict of the jury was for $60,000 and the trial court reduced it $15,000 to $45,000. Appellant contends it should be further reduced, citing seven decisions of this court to which we have added three others.[2] The respondent was about 37 years old when injured. He

[2] Smiley v. St. L.-S. F. Ry. Co., 359 Mo. 474, 483(4), 222 SW. (2d) 481, 487 (7, 8); Counts v. Thompson, 359 Mo. 485, 503(9), 222 SW. (2d) 487 (20-23); Hilton v. Thompson, Trustee, 360 Mo. 177, 195-8(13), 227 SW. (2d) 675, 684-6 (23-27); Prince v. K. C. So. Ry. Co., 360 Mo. 580, 591-3(8), 229 SW. (2d) 568, 575 (10-13); Osburn v. K. C. So. Ry. Co.. 360 Mo. 813, 816-20(2), 230 SW. (2d) 856, 861 (4, 5); Hayes v. Wabash Rd. Co., 360 Mo. 1223, 1237 (4), 233 SW. (2d) 12, 16-9 (4, 5); Abernathy v. St. L.-S. F. Ry. Co., 237 SW. (2d) 161, 164-6; Timmerman v. Term. Rd. Ass'n., 362 Mo. 280, 241 SW. (2d) 477, 486-7 (16); Blew v. A., T. & S. F. Ry. Co., 245 SW. (2d) 31, 35-6(6); Pinter v. G., M. & O. Rd. Co., 362 Mo. 887, 245 SW. (2d) 88, 92-94(4).

had had three years high school education, and worked at various kinds of jobs such as selling newspapers, joining a C.C.C. Camp, ground keeper at a golf course, bell man at a hotel, and employment by a beverage company. He made his first pay trip for the appellant railroad as a brakeman on April 25, 1942, and in February, 1945 was advanced to the seniority list of trainmen available for service as conductors, but not on a regular run—though he had served as a passenger conductor on occasion. He had been in regular employment by the appellant for over seven years when he was injured. We assume he was married and had a home and a family, since he testified that he took care of his children while laid off. After the injury he worked some for a trucking company as a truck dispatcher or checker. As already detailed he had had at least two previous injuries and two surgical operations, from all of which he said he had recovered. He was surgically treated in the railroad hospital. In view of these facts we think the judgment below for $45,000 should be further reduced $10,000 to $35,000. Respondent worked four months after the injury and is not totally disabled. Other avenues of employment should be open to him. If the respondent will within fifteen days from the date of the filing of this opinion enter a remittitur of $10,000 the judgment for $35,000 will be affirmed as of the date of the original judgment, October 6, 1950; otherwise the $45,000 judgment will be reversed and the cause remanded for a new trial. All concur.