**VOTRAIN**

v.

**ILLINOIS TERMINAL R. CO.**

No. 43370.

Supreme Court of Missouri.

En Banc.

June 14, 1954.

Ely & Ely, Robert C. Ely, Alphonso H. Voorhees, St. Louis, for appellant.

Mortimer A. Rosecan, St. Louis, Inman, Dyer, Gray & Dreher, Charles E. Gray, St. Louis, for respondent.

LOZIER, Commissioner.

Action under the Federal Employers' Liability Act, 45 U.S.C.A. §§ 51–60. Plaintiff had a $75,000 verdict and, in compliance with the trial court's conditional order, remitted $30,000. Defendant appealed, alleging error: In refusal of an instruction, in overruling defendant's motions for a directed verdict and in failing to grant a mistrial for alleged improper argument by plaintiff's counsel. Defendant also contends that the $45,000 judgment is excessive.

Plaintiff sustained his injuries in a fall into the elevator shaft at defendant's 12th and Delmar Station. The elevator was operated between the track, mezzanine and station (or street) levels. There was a ceiling light in the elevator that "lights up the interior of the cage fairly well." There were no lights in the elevator shaft. The shaft doors, 7′–10′ wide, were controlled

by an interior hinge-and-bar mechanism which caused them to slide open from the left to the right (of a person facing them from the exterior). These doors closed automatically. They were opened from the interior by the operator manually pushing down on the bar. From the exterior, they could be opened only by inserting a "key" (a piece of wire about 10 inches long and ¼ inch in diameter, with a loop in one end) through a hole in one of the doors and pushing down on the mechanism; this opened the left door sufficiently to enable the operator to insert his left hand, push down on the bar, slide the doors to his right and thus open them completely. There were two "keys." One, for use only in emergency, had to be receipted for when taken out of the ticket office. The other was delivered by the operator going off duty to the operator who relieved him. Custom, practice and company rules were that the only person who should, or had the duty or authority to, operate the elevator was the person who had the key in his possession; "the man that had the key was in charge of the elevator." Not to plaintiff's knowledge had any employee ever operated the elevator unless he had the key. The company rule was that the employee operating the elevator "was to at all times keep the key on his person."

Plaintiff had been defendant's employee for about 4 years prior to June 25, 1950. In 1948, he had worked on the freight dock at the 12th and Delmar Station and had operated the elevator during the noon hour. On June 25, 1950, he was, and for about a month had been, an elevator operator-ticket agent-baggage clerk at that station. According to plaintiff, he "was supposed to come to work at 12 o'clock midnight and then I was supposed to run the elevator 2 hours and after that I was a baggage man; in other words, I unloaded mail from the street level and taken it down on the elevator and put it in the baggage car. After that, I was supposed to run the elevator until 6:40 in the morning and then after 6:40 I was the ticket agent. * * *. It was understood that I would be late (in reporting each night) for I

caught * * * a train from Edwardsville (where he resided) to St. Louis and it arrived at approximately ten after 12." Plaintiff had discussed this matter with his superiors and had their permission to arrive about 10 minutes late.

On the night he was injured, plaintiff left the train at the track level and rode the elevator, operated by John Oscar Thomas, the "second trick" operator, to the station level. Plaintiff did not recall whether there were other "up" passengers. Plaintiff said: "And he handed me the key and I don't know exactly where it was * * * but it was close to the top floor and I said, 'So long,' and I went out the door. * * * The practice was when he handed me the key he was off duty." Plaintiff did not recall whether the doors were closed or were closing as he left the elevator. The last time he saw Thomas, the latter was still in the cage, standing at the controls.

Plaintiff's first duty after he reached the station level was to go to the baggage room, get a bundle of newspapers, take them (on the elevator) to the track level and put them on a 12:15 a. m. train. When the elevator reached the station level that night, Thomas, still at the controls, opened the doors and plaintiff stepped off. Thomas gave him "no warning or other notice of any kind as to whether he was going to remain on duty * * * and did not say anything at all about the fact that he was not going to leave but was going to operate the elevator."

Plaintiff ran to the baggage room, grabbed the newspapers and returned to the elevator doors. Approximately a half-minute had elapsed. He used the key, opened the left door slightly and started to slide back the doors. As he was facing the doors and using a foot and a shoulder to push them back, a woman asked him for some train information. "She came up in back of me when I was starting to open this door. * * * I was talking to her over my right shoulder * * * and as I was talking to her I got this door partly open * * * and as I was opening the door I

was also turning * * *." His purpose in turning was: "When I got the door all of the way open I would be facing her." Plaintiff continued to talk to her "all the time I was doing that * * *. She had missed this Alton car and she was worrying about if she could catch another one and I explained to her that she could catch this quarter to one Alton car."

Plaintiff "got the door all the way open" and was "leaning against the door with my shoulder and talking to the lady. * * * I finished talking to her and I stepped back —the last I seen of her I was facing her; when I got through talking I stepped back." He stepped "straight backward," his "back was exactly to the door * * * and to the elevator shaft. * * *

"Q. What did you do? A. All I had to do was step backward and the elevator wasn't there and the door closed automatically by itself.

"Q. How far back did you have to step by the time that the lady said 'Thanks'— just a short distance? A. Just a short distance.

"Q. A matter of inches? A. Just a matter of inches.

"Q. Did you look in the elevator before you stepped back? A. No, sir. * * *

"Q. You said you didn't look back or look in before you stepped back? A. That's right. * * *

"Q. What happened after you stepped back? A. Well, the elevator wasn't there. * * *

"Q. Did you realize that there was no light behind you when you opened that door? A. I don't recall, sir.

"Q. Did you stop to consider whether there was or not? A. No, sir." Plaintiff fell to the top of the cage (which Thomas had taken to the track level), a distance of 22 feet.

Thomas (defendant's witness) agreed that delivery of the key put him off, and plaintiff on, duty and that after plaintiff relieved him he "was through." Thomas said that he did not have to go back to the track level to leave the station and that he usually left from the station (street) level. Obviously, the jury did not believe Thomas' testimony that he had not given plaintiff the key and that plaintiff must have taken it out of his hip pocket without his knowledge. Thomas said that, arrived at the station level, he opened the door, the "up" passengers got off, Thomas, holding the doors open, stepped out to look at the station clock and plaintiff got off; four "down" passengers entered the cage and Thomas took them to the track level; plaintiff's body "hit the top of the cage" as those passengers were leaving the elevator.

Mrs. Rose Burton (defendant's witness) was working at the newsstand that night. She saw several persons get off the elevator, saw Thomas hold the doors open and step out and "glance at the clock," and saw plaintiff get off. "He had the key in his hand." She saw him go toward the baggage room and return "at a kind of a trot" to the elevator doors; "and I seen him put the key in and the left shoulder was kind of in the door and someone spoke or said something, I couldn't hear what they were talking about * * * and the next thing I knew, I seen his feet flying in the air. * * * It was a lady that spoke to him."

Defendant first complains of the refusal of its Instruction D, viz.: "The court instructs the jury that plaintiff admits that he did not look where he was stepping before he stepped into the elevator shaft and fell, and you are therefore instructed that plaintiff was negligent. If you further find that such negligence of plaintiff was the sole cause of his fall and his injuries and that defendant was not negligent, as outlined in other instructions, then you are instructed that plaintiff cannot recover from defendant in this suit, and your verdict shall be against plaintiff and in favor of defendant." Defendant contends that plaintiff was negligent as a matter of law, arguing: "Plaintiff had but to look slight-

ly in order to see that the elevator was not at the street level and common prudence would dictate that he must look before stepping backward into an elevator shaft even though he might think that the elevator was there. In addition, plaintiff testified that when he left the elevator to go to the baggage room, John Thomas was still at the controls of the elevator, and that is the last that plaintiff saw of Thomas or of the elevator itself. When he returned, the elevator door was closed, but he made no attempt at any time to determine by the use of his sight whether or not Thomas or anybody else had moved the elevator."

However, this argument ignores the evidence as to other circumstances which the jury was entitled to consider. We believe that, in this case, the trial judge was required to submit to the jury whether, in stepping into the shaft "without looking to see if the elevator was there," plaintiff was negligent. As this is a Federal Employers Liability Act case, negligence must be determined by principles established and applied by the Federal Courts. Urie v. Thompson, 337 U.S. 163, 69 S.Ct. 1018, 1027[14–16], 93 L.Ed. 1282. "It is the clear Congressional intent that, to the maximum extent proper, factual questions in actions arising under the Act should be left to the jury; * * * that the jury has the right to make all reasonably possible inferences from such probative facts in the evidence as the jury chooses to accept * * *." Malone v. Gardner, 362 Mo. 569, 242 S.W.2d 516, 520[2, 3].

The instant jury could reasonably have found that, under all of the circumstances, plaintiff was negligent in stepping into the elevator shaft without looking to see if the elevator was there. On the other hand, the jury could reasonably have found, under the circumstances shown in evidence, that plaintiff did not fail to exercise ordinary care for his own safety and was therefore not negligent. In determining whether plaintiff exercised such care, the jury was entitled to consider these circumstances: The custom, practice and company rule that the employee to whom the key was delivered was required to keep the key on his person at all times while on duty and to deliver it to the operator whom he relieved; possession of the key vested in the possessor sole charge of the elevator and the sole right to operate it; so far as plaintiff knew, no employee other than the one having possession of the key had ever operated the elevator; after Thomas handed plaintiff the key, plaintiff was on duty and Thomas was not; whether plaintiff knew that Thomas knew that he (plaintiff) would rush back to use the elevator to take the newspapers to the track level; Thomas did not tell plaintiff that he was going to operate the elevator after plaintiff relieved him or warn plaintiff that the elevator might not be at the station level when he (plaintiff) came back with the newspapers; Thomas usually got off the elevator when plaintiff did, and left the station at the station (street) level. These facts constituted *some* assurance to plaintiff that the cage would still be at the station level when he returned. We think that the extent of such assurance was for the jury. Furthermore, the jury was entitled to consider the circumstance of plaintiff's attention being distracted by his in-line-of-duty conversation with the woman to whom he gave train information. We rule that the trial court properly refused to instruct the jury that plaintiff was negligent as a matter of law.

Defendant cites these cases: Senseney v. Landay Real Estate Co., 345 Mo. 128, 131 S.W.2d 595; Cox v. Bondurant, 220 Mo.App. 948, 7 S.W.2d 403; F. W. Woolworth Co. v. Davis, 10 Cir., 41 F.2d 342; Sodomka v. Cudahy Packing Co., 101 Neb. 446, 163 N.W. 809. We do not understand that these cases establish a rule that a person who, *under any circumstances,* steps into an elevator shaft without ascertaining that the cage is at that floor is negligent as a matter of law. In all four cases the court applied to the particular facts the principle stated thus in F. W. Woolworth Co. v. Davis, supra: "What is reasonable care, for plaintiff and defendant alike, is determined in the light of attend-

ant circumstances." 41 F.2d 349[19, 20]. And in each of those cases, the circumstances under which the plaintiff stepped into the shaft were quite different from those in the instant case. For example, in the first three, there was no evidence of any assurance of any kind—custom, practice or rule—that the elevator would be at the floor where the plaintiff attempted to enter it. And in none was the plaintiff's attention distracted.

Defendant next says that its motions for a directed verdict should have been sustained. Defendant concedes that it "was negligent in that John Thomas, defendant's employee, handed to plaintiff the key to the elevator and subsequently, while plaintiff was going to the baggage room (to get the newspapers), Thomas took the elevator from the street level down to the track level." However, defendant argues: "Plaintiff's own testimony convicts him of negligence as a matter of law, which proximately contributed to his injuries; and even if defendant's employee was negligent in moving the elevator after giving the key to plaintiff, the fall sustained by plaintiff was not the natural and probable consequence of the employee's negligence, nor should it have been foreseen in the light of the attending circumstances. * * * Any negligence of defendant was not a proximate cause of plaintiff's fall and injuries and plaintiff's negligence was the sole proximate cause thereof."

■■ The "usual test as to causal connection is whether the facts show that absent the negligent act, the injuries would not have been sustained." Wood v. St. Louis Public Service Co., 362 Mo. 1103, 246 S.W.2d 807, 811[3–5]. And see Domitz v. Springfield Bottlers, 359 Mo. 412, 221 S.W.2d 831, 832[1–5]. It is very clear that the jury reasonably could have found that Thomas' negligent act in removing the elevator contributed "in whole or in part" to cause plaintiff's injuries. We hold that that issue was properly submitted to the jury.

The cases defendant cites are inapplicable. In neither Senseney v. Landay Real Estate Co., 345 Mo. 128, 131 S.W.2d 595, nor Sodomka v. Cudahy Packing Co., 101 Neb. 446, 163 N.W. 809 (both "elevator cases"), did the court rule the matter of defendant's negligence and whether, if the defendant was negligent, such negligence contributed to cause plaintiff's injuries. In Louisville & N. R. Co. v. Davis, 6 Cir., 75 F.2d 849, and International-Great Northern R. Co. v. Lowry, 132 Tex. 272, 121 S.W.2d 585, it was held that the injuries of the employee, suing under the Federal Employers Liability Act, resulted solely from his own negligence. Neither was an "elevator case"; each involved circumstances quite different from the instant facts.

Defendant's third assignment is: "The trial court erred in failing to grant defendant's motion for a mistrial when plaintiff's counsel argued damages and the amount of the verdict in his final argument to the jury." Plaintiff's petition had asked damages in the sum of $85,000. (No money amount was mentioned in the instructions.) In his opening argument, plaintiff's counsel discussed the evidence as to the liability issue and concluded thus: "My time is half up. What I would like to develop, if I can be of any assistance to you, is how we are going to compensate a man for these lifetime injuries. That is going to be the toughest problem that I think you will ever have for the rest of your life in deciding the affairs of other people. I don't think you are ever going to be vested with a more serious grave problem, than to translate a human being's pain and suffering for a lifetime into terms of dollars and cents and in my closing argument I would like to offer whatever assistance I can in that connection to you."

Defendant's counsel discussed the evidence as to the liability issue and concluded thus: "* * * and I ask you to recall this, how long has Norman Votrain been sitting back there during the course of this trial without getting up and walking around? It is not in evidence in this case but it is evident to you if you have looked."

Plaintiff's counsel began his closing argument by replying to defendant's counsel's last question. Next, he answered defendant's counsel's argument on the liability issue. He then argued the evidence as to plaintiff's damages—the nature, extent and permanency of his injuries, his $3,000 annual wages, his inability to perform manual labor, and his past, present and future pain and suffering—all without objection by defendant. Continuing: "We have tried to be fair in asking for damages in this case. You know sometimes lawyers sue for much more than they really think the case is worth in the hope that a jury will sort of give them half of it. We didn't do that in this case. We studied this and we tried to be just as fair and as honest about it as we can, and we are asking for $85,000, $85,000—

"Mr. Ely (defendant's counsel): I object to that. There has been no mention made of the amount in the first half of counsel's argument and it gives me no opportunity to rebut it. I have no opportunity to argue against it, or in response to it, and for that reason, I object to it and ask that the court declare a mistrial. * * *

"The Court: The jury will disregard that particular statement as to the amount. The objection will be sustained and the motion for a mistrial will be denied and you will not take it into consideration at the time of your deliberations and anything that has been stricken and you are told that it is to be stricken, you are not to take into consideration at the time you deliberate on the case.

"Mr. Rosecan (plaintiff's counsel): You jurors have to fix the amount and I hope you will not bring in a verdict for more than $85,000 because that verdict wouldn't be worth anything. In the eyes of the court—

"Mr. Ely: I object to that statement and I move the court to declare a mistrial because of Mr. Rosecan's repetition.

"The Court: I will deny the motion for a mistrial. The jury will disregard the last statement about the amount and not take it into consideration at the time of their deliberation on the case."

■ We shall assume without deciding that the trial judge correctly sustained defendant's objections. Generally, the purpose of closing argument by counsel for the party having "the burden of the issues" is to answer the argument of counsel for the other party, the one "holding the negative." See 64 C.J., Trial, Sec. 267, pp. 248, 249, and Friedman v. United Railways Co. of St. Louis, 293 Mo. 235, 238 S.W. 1074, 1077 [10], both cited by defendant. By custom and better practice, closing argument should be in rebuttal. In the Friedman case, supra, we held that under the circumstances the trial court had "a sound judicial discretion" to permit, and had not abused that discretion in permitting, the plaintiff's counsel to make a "closing argument" after the defendant's counsel had waived argument. 238 S.W. 1077[10]. Defendant concedes that the trial judge has a wide discretion in ruling both the impropriety and the prejudicial effect of argument of counsel, and that his rulings are generally deferred to by the appellate court. Griffith v. Gardner, 358 Mo. 859, 217 S.W.2d 519, 530[18], 531[19]. Here, the trial court promptly sustained defendant's objections to the mention of $85,000 and instructed the jury to disregard that statement and not to consider it in its (the jury's) deliberations. "Under these circumstances, where the trial court instructed the jury to disregard what had been said, we cannot rule that the court abused its discretion in refusing to discharge the jury." Glenn v. City of Springfield, Mo.Sup., 254 S.W.2d 632, 635[5]. And see Warning v. Thompson, Mo.Sup., 249 S.W.2d 335, 353[14], 30 A.L.R.2d 1176.

There is no merit in defendant's contention that plaintiff's counsel violated this portion of Supreme Court Rule 4.22: "It is not candid or fair for the lawyer knowingly * * * where a side has the opening and closing arguments to mislead his opponent by concealing or withholding positions in his opening argument upon which

his side then intends to rely." [1] In his opening argument, plaintiff's counsel did not withhold or conceal his position as to plaintiff's damages. Compare Cumming v. Allied Hotels Corporation, Mo.App., 144 S.W.2d 177, 182[11]. Defendant's cited cases are not in point. St. Louis & S. F. R. Co. v. Vanzego, 71 Kan. 427, 80 P. 944, and Friedman v. United Railways Co. of St. Louis, 293 Mo. 235, 238 S.W. 1074, involved the propriety of permitting a "closing" argument after the defendant's counsel had waived argument. The court rule involved in Bender v. Mettler, Tex.Civ. App., 17 S.W.2d 182, was applied under circumstances quite different from the instant circumstances.

Plaintiff was 24 years old when injured, 26 at trial time, April, 1952. His injuries consisted of a compression fracture of the third and fourth dorsal vertebrae, fractures of the transverse processes of the first, second, third and fourth lumbar vertebrae on the left side and fractures of the left radius and the coronoid process of the left ulna, both at the elbow. He regained consciousness later that morning (June 25, 1950) in the hospital. Boards were put under his mattress. On June 28, the elbow was operated on and a loose fragment removed. Sometime between July 5 and July 11, he was placed in an armpits-to-buttocks cast and confined to his bed. He remained in the hospital 20 days. About 2 weeks after his first release, he was in the hospital 13 days for treatment for abscesses which had developed on his buttocks. The cast was removed about 10 weeks after he first left the hospital. Meantime, he went to the hospital once a month for examination and, thereafter, once every other month for a "check-up" on his back. During all that time plaintiff had headaches, his back "ached like a toothache, a constant toothache," and his elbow "throbbed and pained like a needle was being stuck in it."

Dr. Joseph A. Lembeck (defendant's witness) had treated plaintiff at the hospital and had assisted in the elbow operation. When he last examined plaintiff, on March 6, 1951, Dr. Lembeck "thought he was physically able to resume his regular work on March 12, 1951." A few days later, although he was "feeling not too good," his back and elbow were "paining him," he had "continuous headaches" and his legs "felt like they were asleep," plaintiff returned to work for defendant as a watchman. Plaintiff said that, while the work was not strenuous, he "tried it two nights and the pain got so bad I had to quit." Other than those two nights, plaintiff has "done no work" because he has "not been able to." Because he "knew that I couldn't do physical labor any more," plaintiff applied for a leave of absence and took training in accounting under the G. I. Bill of Rights. For five hours a day, five days a week, he sat at a desk. This caused the back and leg pains to get so bad, he would get up and walk around, which relieved his back but not his legs. He attended the accounting school for about 7 months, during which time he was paid $960 by the government. He still suffers from continuous headaches, pains in his back and elbow and his legs still "feel like they are asleep." When he tried lifting and stooping at home, the pain in his back, elbow and legs "gets worse" and his headaches increase in severity. His weak elbow hurts when he picks up anything with that arm. His back hurts more when he is sitting down. He sleeps on a heating pad which "eased the pain a little" for a while but no longer does.

Under the medical evidence of both parties, the healing processes of the vertebrae and the elbow had been completed at trial time. Dr. Leon Fox (plaintiff's witness), who examined plaintiff on March 24, March 28 and April 2 (1952, apparently), testified also as to X-rays taken at the hospital in

1. The last word is "rely" in the rule as adopted November 1, 1934, and as printed in our Supreme Court Rules pamphlets and Vols. 334–341, Missouri Reports. But we understand why instant defendant, in quoting the rule in its brief, used "reply" instead of "rely." The January 18, 1945, revision merely renumbered the rule. However, in subsequent pamphlets, in 2 RSMo 1949 (p. 4117), in 42 V.A.M.S. (p. 40), and in Vols. 342–352 (the last volume of the Missouri Reports in which the Canons of Ethics were published), the word erroneously appears as "reply."

June, July, September and November, 1950. Dr. Fox said that the fractures of the vertebrae necessarily involved straining of the muscles, ligaments, soft tissues and periosteum (the covering of the bones and associated nerves); and that the damage to the soft tissues is considerably more than the damage to the bone structures. All this, he said, is "productive of pain." In his opinion, plaintiff would "have pain the rest of his life. * * * He will continue having pain which will be of a permanent nature." As to the elbow, Dr. Fox thought the pain would become worse. "He is still having pain after two years and he has weakness in his grip. * * * He will never be able to do the heavy lifting with this elbow that he was able to do prior to the accident. * * * He has pain in his back * * * and if he does heavy lifting that will produce pain; the same is true of the elbow." The back fractures can cause pain if the patient sits too long and the back injury can be productive of pain if the patient is moved or even when he is quiet. Asked if anything could be done for plaintiff to relieve him of pain, Dr. Fox said: "As far as the back is concerned, it is possible that a spine fusion, in which the vertebrae over the involved area are bridged with bone might help him some. There is no certainty however in that operation. It fails in about half the cases."

Dr. Lembeck, who had not examined plaintiff since March, 1951, did not know plaintiff's condition at trial time. Conceding that he would expect a man to suffer pain from two compression fractures in the dorsal area, Dr. Lembeck (testifying for defendant) would "not necessarily expect that pain to last a lifetime." (He made no response to the question, "You don't think it would?") If the four transverse processes "healed in good position," Dr. Lembeck "would not expect plaintiff to have pain in the lower back * * * if the bone density is good, they don't ordinarily cause disabling pain"; plaintiff might have some pain in his elbow.

Dr. E. C. Funsch (defendant's witness), had examined plaintiff at defendant's request about three months before the trial. He made a complete examination, including taking X-rays of the back and elbow. Plaintiff complained of soreness between the shoulder blades and in the left elbow, and said that certain movements (in the course of the physical examination) caused pain in the back, chest and abdomen. In Dr. Funsch's opinion, the injured elbow "would not be productive of continuous chronic pain"; but plaintiff won't be able to do heavy lifting with his arm or twisting or anything that requires unusual effort without having some pain in his elbow. As to whether the injuries to the soft tissues of the vertebrae would clear up, Dr. Funsch said: "Well, that is pretty hard to say. I saw this man in '52 and if he was hurt in '50, he still has some complaint in that area. * * * Now he still complains of some soft tissue injury in that involvement in that area and as time goes on he could get to the place where he would have less pain. I doubt, however, with that type of injury that he will be entirely free of pain. He may have some pain and discomfort in that area after considerable use or change of weather. Some people it bothers more than others. It depends on what type of work he does and how strenuous it is. * * * Depends on the extent, some have pain and some don't; * * * no two cases are alike. * * * This man has a good range of motion which is all in his favor, but he could have some soreness in that after considerable use of the back. Now how much use it would take to make it sore, I can't say. There is no way I can measure that. He may do a lot of work and he may do a little." Dr. Funsch had personally seen cases similar to plaintiff's in which persons "have had pain in the lower part of the back the rest of their life."

Was the $45,000 judgment excessive? The undisputed evidence was that: Plaintiff was in the hospital 33 days and was an "out patient" for about 6 months thereafter (he made no claim for hospital, medical or surgical expenses); he was in a cast for 10 weeks; an operation was performed on his elbow; his weekly salary had been $57; he worked the 2 days in March, 1951, and has not done any kind of

work since. Plaintiff's evidence and defendant's evidence favorable to plaintiff established: A back condition which might be corrected by a spinal fusion, "fifty-fifty chance" operation; permanency of headaches and pains in the shoulders, back and legs; certain increase in the intensity of the back pains in lifting objects; permanent weakness in the left arm and hand; permanency of pain in the left elbow, especially in lifting objects, the degree of which will increase; inability to sleep; inability to perform manual labor involving lifting objects and difficulty of doing work while sitting down.

"These questions of seeking (so far as humanly possible) to attain and maintain a standard of uniformity in personal injury judgments are exceedingly difficult. No two cases present the same facts as to injuries, resulting disability, and other important factors." Curry v. Thompson, Mo. Sup., 247 S.W.2d 792, 799[6–8], 31 A.L.R. 2d 1225. Recognizing this, defendant cites cases which it says are "merely suggestive" of the amount of plaintiff's damages and plaintiff cites cases which he says "are analogous." We have studied those cases but need not discuss them all. Suffice to say that our examination shows that, *in general*, instant plaintiff's damages are comparable to those sustained by the plaintiffs in these cases in which this court has (during the last four years) approved awards ranging from $25,000 to $40,000: Curry v. Thompson, Mo.Sup., 247 S.W.2d 792, 31 A.L.R.2d 1225 ($25,000); Hilton v. Thompson, 360 Mo. 177, 227 S.W.2d 675 ($30,000); Cassano v. Atchison, T. & S. F. Ry. Co., 362 Mo. 1207, 247 S.W.2d 786 ($35,000); Abernathy v. St. Louis-San Francisco Ry. Co., Mo.Sup., 237 S.W.2d 161 ($35,000); Hayes v. Wabash R. Co., 360 Mo. 1223, 233 S.W.2d 12 ($37,500); Pinter v. Gulf, Mobile & Ohio R. Co., 362 Mo. 887, 245 S.W.2d 88 ($40,000). However, in the Pinter case, the plaintiff had undergone an ineffectual back operation, had to wear a sacroiliac girdle, had an unstable gait, and, in addition to his pain and headaches, sustained some loss of sensation. And in the Hayes case, the plaintiff had to wear a steel body brace, walked with an awkward gait, could not bathe or dress himself and had to take sedatives, "pain killers" and alcohol rubs.

Among plaintiff's cited cases are: Blew v. Atchison, T. & S. F. Ry. Co., Mo.Sup., 245 S.W.2d 31; Warning v. Thompson, Mo. Sup., 249 S.W.2d 335, 30 A.L.R.2d 1176; and Tatum v. Gulf, Mobile & Ohio R. Co., 359 Mo. 709, 223 S.W.2d 418. However, in each the plaintiff's injuries were far more serious than instant plaintiff's. In the Blew case ($50,000 award), in addition to his back injury, the plaintiff sustained fractures of his right elbow and left ankle (requiring 4 operations upon each) and of his left wrist and had to wear a steel body brace. In the Warning case ($45,000 award), the injuries of the plaintiff (whose lost earnings to trial time, incidentally, were $14,800 as compared with instant plaintiff's $3,000) included fracture, calcification and weakening of the joint of the odontoid process with possibility of a subsequent break, a damaged spinal cord probably, and an impaired sensation in the left side of his head, face, shoulder, body and leg; one operation was performed without the use of an aesthetic and he lay for a month in the hospital in traction, his head lower than his feet; his ability to speak was affected and he usually had to sleep in a chair; he wore a metal collar for 6 months. In the Tatum case ($42,500 award), the plaintiff had to use crutches for 6 months and thereafter had to use a cane, wear a Taylor brace and massage his back twice daily.

■ Considering the nature, extent and permanency of plaintiff's injuries and disability, his pain and suffering, his age and life expectancy, his loss of earnings to trial time, his future earning capacity, the present purchasing power of the dollar, the size of awards permitted to stand in (as nearly as can be) comparable cases, we believe that the $45,000 judgment (even though entered after the $30,000 remittitur required by the trial court) is excessive by $10,000. If, therefore, plaintiff-respondent will, within fifteen days after the date of the filing of this opinion, enter here a remittitur for $10,000, as of the date of the $45,000 judgment, the judgment will be af-

firmed for $35,000; otherwise the judgment will be reversed and the cause remanded.

VAN OSDOL and COIL, CC., concur.

PER CURIAM. The foregoing opinion by LOZIER, C., is adopted as the opinion of the court.

HOLLINGSWORTH, DALTON and HYDE, JJ., concur.

CONKLING, J., dissents in separate opinion.

CONKLING, Judge (dissenting).

Believing that the trial court should have given instruction D, which is quoted in paragraph ten of the principal opinion prepared by Commissioner LOZIER, I respectfully dissent.

Examination of the transcript of the record and the exhibits filed discloses that this plaintiff elevator operator himself unlocked and opened this elevator door; that he "got the door all the way open" and without making any use of his eyes or other senses to determine whether the elevator was at his floor he turned his back to the open door of the unoccupied and dangerous elevator shaft. After he had answered an inquiry he stepped backward "just a matter of inches" into the open elevator shaft. Plaintiff was one of the operators of that elevator. He knew there was a light in the elevator, and he had just come up in that elevator less than a minute before he fell. He testified that he did not recall whether he realized there was no light there when he opened the elevator door. Under the circumstances here I think plaintiff was negligent as a matter of law. O'Dell v. Dean, 356 Mo. 861, 204 S.W.2d 248, and cases there cited; Senseney v. Landay Real Estate Co., 345 Mo. 128, 131 S.W.2d 595, and cases there cited; Sodomka v. Cudahy Packing Co., 101 Neb. 446, 163 N.W. 809; F. W. Woolworth Co. v. Davis, 41 F.2d 342; Cox v. Bondurant, 220 Mo.App. 948, 7 S.W.2d 403.

In Senseney v. Landay Real Estate Co., supra [345 Mo. 128, 131 S.W.2d 598], in which case the plaintiff had himself opened the elevator door with a key similar to the one used by Votrain in the instant case, and then had walked into the open elevator shaft, in ruling Senseney was negligent as a matter of law, this Court said that "a *closed* elevator door is a *warning* to look before entering". [Emphasis supplied.]

It is my opinion that neither custom, practice, rule, possession of the key, distraction of attention nor any of the other matters suggested in paragraph twelve of the principal opinion, nor any other matters not suggested, either singly or in combination, were or could be any assurance that the elevator in that shaft was then at that particular floor. Nature gave man eyes with which to see; and it is my opinion that one who has eyes should not be permitted to thus excuse his confessed failure to use them under these circumstances.

Plaintiff did not even recall whether he realized that there was no light in the shaft when he opened the door. The very absence of light when he opened those doors warned him there was no elevator there. It was his affirmative duty to see and to take note of what he saw. In O'Dell v. Dean, supra, in the ruling that it was negligence as a matter of law to open an elevator door and then step into an open elevator shaft, we approved the following language from Central Publishing House of Reformed Church in United States v. Flury, 25 Ohio App. 214, 157 N.E. 794, 798:

"Darkness is nature's own warning to arouse the natural instinct of self-protection, the first law of nature. Indifference to such an instinct is a clear violation of a fundamental physical law, and should be, under circumstances like those of the instant case, more impressive and convincing than a sign 'Danger,' nailed on the door. Darkness was a danger in the instant case that stood gaunt and menacing in front of the eyes of the plaintiff, and under such circumstances as appear in

this record to enter the (elevator) shaft is, in our judgment, such contributory negligence as should prevent a recovery in law."

Our attention has not been directed to a case, and my research has not revealed one, where recovery was allowed to even an invitee who fell into an elevator shaft which plaintiff knew to be such a shaft, and which had thereon a guard or door, and where the person who fell opened the door and fell therein without any precaution to find out if the elevator was there. And in cases which have presented facts similar to this case, or to the O'Dell case, or to the Senseney case, the courts seem to have uniformly ruled that such person was negligent as a matter of law.

I cannot escape the conclusion that Votrain was guilty of negligence as a matter of law, and that defendant, even in this Federal Employers Liability case, was entitled to have the jury so instructed. Atchison, Topeka & Santa Fe R. Co. v. Ballard, 5 Cir., 108 F.2d 768.

Even if it be conceded that defendant was negligent in that Thomas handed the key to plaintiff and thereafter moved the elevator, it was neither foreseeable therefrom nor was it the natural and probable consequence of Thomas' act that plaintiff would open the door into the shaft, fail to observe the absence of the elevator and then step either backward or forward into the open shaft. It is my view that under the instant circumstances, plaintiff's negligent act of stepping into the open elevator shaft was the independent, intervening and efficient sole cause of his injuries, a personal act of plaintiff over which defendant had no control whatever, and one which Thomas had no reason whatever to anticipate, and without the intervention of which plaintiff would not have been injured. I do not believe that it should be held that, in law, any act of Thomas contributed in whole or in part to cause plaintiff's injuries.

Instruction D told the jury, as I think the jury should have been told, that plaintiff was negligent; and further instructed them that if plaintiff's negligence was the "sole cause of his fall * * * and that defendant was not negligent, as outlined in other instructions," then plaintiff could not recover. I think it is clear that plaintiff was grossly negligent, and if plaintiff's negligence was the sole cause of his injuries (and I think it was) and if defendant was not negligent as submitted, then it is my view that a finding by the jury of those two last named facts was a proper basis of a verdict for defendant.

I think that instruction D was a proper one, and that its refusal was reversible error.

For the above reasons I respectfully dissent.

Adopted as opinion of the court en banc.

HYDE, HOLLINGSWORTH, DALTON and LEEDY, JJ., and BENNICK and CAVE, Special Judges, concur.

CONKLING, C. J., dissents in opinion filed.